IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No.: 07-CV-01723-WYD-CBS

LARIVIERE, GRUBMAN & PAYNE, LLP, a California limited liability partnership,

Plaintiff(s),

v.

EDWARD H. PHILLIPS, an individual; JOHN C. HERMAN, individually and as a partner of Duane Morris, LLP; ALLEN L. GREENBERG, individually and as a partner of Duane Morris, LLP; DUANE MORRIS, LLP, a limited liability partnership; M. SHANE EDGINGTON, individually and as a member of Hensley, Kim & Edgington, LLC; and HENSLEY, KIM & EDGINGTON, LLC, a Colorado limited liability company,

Defendant(s).

---

**COUNTER CLAIMANT EDWARD H. PHILLIPS' RESPONSE TO LGP'S MOTION FOR SUMMARY JUDGMENT**

---

Defendant / Counterclaimant Edward H. Phillips ("Phillips"), through his counsel Don, Galleher & Saliman, P.C., respectfully submits this Response to Plaintiff LaRiviere, Grubman & Payne's ("LGP") Motion for Summary Judgment, stating as follows:[1]

Cutting through the cold neutrality of its bare factual assertions and legal argument, LGP, in its Motion for Summary Judgment, seeks to have this Court place its imprimatur on the law firm's astoundingly irresponsible and unprofessional behavior. Acknowledging, as LGP must, that it solicited Mr. Phillips' famous patent infringement case fresh from an appellate court remand and less than a half year before trial, the facts (both undisputed and disputed) reveal that LGP spent as much time analyzing how it would be paid a fee and how it could leverage a quick settlement as it

---

[1]     Pursuant to the Court's Order of January 19, 2010 granting Phillips' Motion to exceed page limits, the undersigned states that this Response — not including fact statements authorized by the Court's Practice Standard at III.B. 4 and 5 – does not exceed 40 pages.

did attempting to get up to speed to try Phillips' patent infringement case.  As a result of this misdirected and self-serving effort, LGP failed to understand even the most fundamental details of the case it had solicited — for example, what was the basis for its client's expert testimony, what was his personal knowledge of his own and the patent defendants' products, and what supplementation of his expert report needed to be undertaken — and failed to make any reasonable efforts to work with opposing counsel or the Court to timely clarify what evidence  LGP would present and what it would argue the scope of he claims to be.  If LGP had acted reasonably in learning the case and engaging in pre-trial preparations, it is likely that at minimum it could have (1) expanded the scope and basis for Mr. Phillips' testimony and that of its other expert, (2) tailored the evidence to fit both the allowable scope and prove Mr. Phillips' claims, and  (3) increased the available damages — regardless of the exceptionally substandard work that predecessor counsel Manthei had performed in defining and preserving claims, obtaining evidence, and disclosing evidence through the date of his termination for cause.

Instead of discussing its own performance, LGP's Motion for Summary Judgment attempts to blame its predecessor counsel, Carl Manthei.  In large measure, the motion is predicated on an overarching theme that all of the problems in the case were the result of Manthei's conduct, and that nothing LGP could have done could have led to a different result.  This argument is astounding: in essence, these attorneys are asking this Court to hold that when a predecessor attorney has done a substandard job of preparing a case, a lawyer replacing the first lawyer does not have to do anything within the standard of care to fix the case if possible, or work around the limitations if they cannot be fixed, because the case as inherited is so poor that nothing will make it better.  Neither the law of causation in malpractice cases, nor the disputed and undisputed facts of this case, support LGP's motion seeking to essentially eliminate any obligation of care to a client by a lawyer succeeding substandard predecessor counsel.  The Motion for Summary Judgment should be denied.

While LGP's marshaling of the facts and law does not support its proposed summary disposition, its persistent and repeated attempts to shift blame to predecessor counsel pellucidly

demonstrate that, in fairness, a single tribunal with unchallenged subject matter jurisdiction should adjudicate Mr. Phillips' malpractice counterclaims against *both* sets of lawyers.  The arguments raised by LGP should thus be helpful to this Court in addressing a different dispositive motion that has been fully briefed and is ripe for ruling.  Mr. Phillips has filed a Motion to Dismiss this case in its entirety Without Prejudice based on LGP's failure to join Manthei as a required party over whom the Court has no jurisdiction.  Most of the arguments that LGP raises in support of obtaining dispositive relief **with prejudice** reveal why Manthei is a required party here.  LGP's arguments are premised, in large measure, on the idea that it was Manthei's errors that resulted in a case that, four months before trial, was unwinnable.  In his own case, Manthei makes the opposite argument – that it was LGP's failure in presentation that took a case that was almost guaranteed to win on the eve of trial and turned it into a defense victory.  If this Court were to make findings in favor of LGP's position that Manthei's conduct caused the loss, and grant LGP's proposed summary relief, those findings would not bind Manthei in his parallel state court case.  He would still argue,  completely contrary to this Court's judgment, that LGP caused all of Phillips' loss by its conduct.  An LGP victory on this motion could, in all likelihood, result in it being awarded some substantial portion of the $2.55 million fund, and yet it would not limit Manthei's effort to obtain the funds.

Mr. Phillips therefore requests, as a threshold matter, that this Court not address this Motion for Summary Judgment at all.  Instead, Mr. Phillips suggests that this Court, the parties, and the entire system of justice is better served by having this Court dispose of this entire case **without prejudice** so that LGP can re-raise these arguments in a forum where the resolution of this motion, and the consequences of that resolution, will be binding on it, Phillips **and** Manthei.

## II.  PROCEDURAL POSTURE OF THE CASE

Edward H. Phillips did not pick this fight.  The lawyers did.  When Mr. Phillips was able to negotiate a $2.55 million resolution of his grievances with AWH after his case was dismissed because of his lawyers' cumulative errors, LGP approached the trough and demanded that it be paid more than 40% of that sum for its efforts in losing his case.  While Mr. Phillips never intended to

pursue malpractice claims against LGP (or against his predecessor counsel for that matter) once LGP brought a claim against him, which (when coupled with predecessor counsel's claim) seeks nearly 90% of the sum paid by AWH, he was compelled to file his compulsory counterclaims against each attorney.  As a result of jurisdictional deficiencies, those fee claims and counterclaims are now divided between two jurisdictions, where – under Colorado's controlling legal principles – each lawyer is demanding nearly half the fund, and each lawyer is blaming the other for negligence resulting in the failed infringement case.  It is in this procedural context that LGP now files this motion to dispose of every counterclaim against it.

### III.  STATEMENTS OF FACT

In support of its Motion, LGP provided the Court with 138 separate numbered paragraphs of allegations referencing 57 exhibits constituting more than 500 additional pages.  In spite of this massive volume of information, the factual picture painted by LGP is not sufficient for the Court to fully appreciate the details necessary to resolve this Motion, or to establish that there are still significant factual issues precluding the relief sought by the Motion.  In compliance with this Court's Practice Standard at §III.B.4 and 5, Phillips provides both a paragraph-by-paragraph response to LGP's factual recitations, as well as his own statement of additional facts, both disputed and undisputed, required to resolve this Motion:

### A.    RESPONSE TO LGP's STATEMENT OF MATERIAL FACTS

As an initial matter, Phillips states that he denies all allegations of LGP's Statement of Facts that are not expressly admitted, based on the reasons set forth below:

1.    Admit.

2.    Denied.  The '798 Patent provides that the "invention relates to modular construction techniques and more particularly it relates to prisoner detention facilities such as jails and jail cells constructed from building modules.  LGP Ex. 1 at Col. 1, Lines 6-9.

3.    Admit.

4.      Phillips admits that Claim 1 of the '798 Patent speaks for itself, and that LGP appears to have accurately copied that Claim.  *See*, *id.* at Col. 6, Lines 22-34.

5.      Phillips admits that Claim 21 of the '798 Patent speaks for itself, and that LGP appears to have accurately copied that Claim.  *See*, *id.* at Col. 8, Lines 19-24.

6.      Phillips admits that Claim 22 of the '798 Patent speaks for itself, and that LGP appears to have accurately copied that Claim.  *See*, *id.* at Col. 8, Lines 25-30.

7.      Phillips admits that in the late 1980s he was the settlor of the Phillips Family Trust (the "Trust") and that to the best of his knowledge at that time the '798 Patent, as well as other patents, were placed in that Trust.  Ex. A at ¶3.

8.      Phillips admits that the schedule prepared by his bankruptcy attorney in 1991 states "none" on Schedule B.2 Line n.  Phillips admits that at the time of the 1991 Bankruptcy, to the best of his knowledge he had placed the '798 Patent and other patents owned by him into the Trust. *See*, Ex. A at ¶3.

9.      LGP offers no support for this conclusion as required by this Court's Practice Standard (revised ) at §III.B.3.  Phillips states that this allegation is a legal conclusion, rather than an allegation of fact.  Nevertheless, Phillips admits the allegation for purposes of this Motion.

10.     Phillips admits that the schedule prepared by his bankruptcy attorney in 1991 states "$0.00" on the Summary of Debts and Property at Line B-2/n.  Phillips admits that at the time of the 1991 Bankruptcy, to the best of his knowledge he had placed the '798 Patent and other patents owned by him into the Trust. *See*, Ex. A at ¶3.

11.     Phillips admits that the transcript of the August 14, 1991, creditor's meeting (LGP Ex. 4) at 15:22-18:7 and 20:23-21:9 speaks for itself.  Phillips admits that at the creditors' meeting he stated that he had transferred his patents to the Trust "almost three years ago."

12.     Phillips denies that he specifically referenced the Patent by Patent Number at the creditors' meeting, but admits that he stated that he transferred his patent granted in "July of '87" to the Trust.  *See*, LGP Ex. 4 at 17:21-18:1.

5

13.     Phillips admits that he stated at the creditors' meeting that although he had asked his patent attorney to complete transfer papers, to his knowledge there had not been a formal assignment recorded in the U.S. Patent Office.  Phillips admits that there was a document reflecting his assignment of his Patents to the Trust.  Phillips denies that Ex. 4 at 21:5-9, referenced by LGP, establishes this fact.

14.     Phillips admits that at the creditors' meeting he stated that, to the best of his knowledge at the time, the Patents had no value.  Phillips denies that he "testified that his interest in the Trust was not listed on his schedule of assets because the patents had no value" because he had no ownership interest in the Trust.  *See*, LGP Ex. 3 at Schedule B-2/n, LGP Ex. 2 at 13:24-14:13.  The reference cited in support of this paragraph by LGP refers to the value of Mr. Phillips' wife's interest in the Trust, as she was a beneficiary of the Trust.  *See* LGP Ex. 4 at 18:10-15.

15.     Phillips admits that at the time of the creditors' meeting, to the best of his knowledge and belief his Patents had no value.  Phillips denies that he testified that he had abandoned the Patents because, to the best of his knowledge and belief at that time the Trust owned the Patents. *See*, LGP Ex. 4 at 19:21.

16.     Admit.

17.     Phillips admits that the language of paragraphs 9 and 10 of LGP Ex. 5 speak for themselves, and that his attorneys in the pending motion to reopen Bankruptcy Case 91-18661-SBB stated therein that Phillips transferred his interest in the '798 Patent to the Trust in June 1989, and that a formal assignment of the Patent was not filed in the USPTO.

18.     Phillips admits that the language of paragraphs 11 and 23(f) of LGP Ex. 5 speak for themselves, and that his attorneys in the pending motion to reopen Bankruptcy Case 91-18661-SBB stated therein that Phillips did not own an interest in the Patents at the time he filed the Bankruptcy action, and that the Patents were the property of the Trust at that time.

19.     Phillips admits that the agreement referenced at LGP Ex. 6 is an accurate copy of the licensing agreement he entered with AWH in September, 1989, and that the terms of that agreement

6

speak for themselves.  Phillips admits that the agreement terminated by its own terms on December 31, 1990, when Phillips, for himself and the Trust provided AWH with notice that the agreement would not be extended.  Ex. 6 at ¶¶ 3, 4 and 13.

20.     Denied.  The AWH brochure led Phillips to believe that it was possible that AWH was using his technology without his consent.  LGP Ex. 7 at 27:12-25; *Phillips v. AWH Corp.,* 415 F.3d 1303, 1309 (Fed. Cir. 2005).  Phillips admits the second sentence of this paragraph.

21.     Admit.

22.     Admit.

23.     Phillips admits that the complaint in Case Number 97-cv-212 (the "Patent Lawsuit") was filed on or about February 3, 1997.  *See* LGP Ex. 9.

24.     Admit.

25.     Phillips admits that the Complaint in the Patent Lawsuit alleged that the infringement had occurred since 1990 and continued at the time of filing the Complaint.  LGP Ex. 9 at ¶11.

26.     Phillips admits that Manthei and attorney Douglas Vincent both signed the Complaint in the Patent Lawsuit, and that both were his counsel of record in that case at that time.  LGP E. 9 at page 7.

27.     Admit.

28.     Admit.

29.     Admit.

30.     Admit.

31.     Phillips admits that he and Norman Wirkler were disclosed as experts in September or October 1997.  Phillips denies that these were the only experts disclosed in his case.  Ex. A-1.

32.     Phillips admits that under the direction of his counsel Manthei he prepared the September 23, 1997, report and January 6, 1998, supplemental report attached as LGP Ex. 11 and 13.

33.    Admit.

34.    Admit.

35.    Admit.

36.    Phillips admits the first sentence of this paragraph. Phillips denies the second sentence of the paragraph. Phillips does not know why Manthei choose not to proceed with the damages expert. Phillips only knows that Manthei informed him that Manthei was not going to pay the damages expert. Ex. 15 at 145:23 - 146:12.

37.    Admit.

38.    Phillips admits that the claim term "baffle" was an important term. Phillips admits that the parties stipulated that the meaning of the word "baffle" is a "means for obstructing, impeding or checking the flow of something." Phillips admits that LGP has attached a true and correct copy of the November 22, 2002, Order as LGP Ex. 16, and that the language of that Order speaks for itself. Phillips admits that the quoted language contained in this paragraph appears to be an accurate quotation from page 12 of the Order attached at Ex. 16.

39.    Phillips admits that the claim term "substantially parallel-piped" is a term in Claim 1 of the '798 Patent. Phillips admits that LGP has attached a true and correct copy of the November 22, 2002, Order as LGP Ex. 16, and that the language of that Order speaks for itself. Phillips admits that the quoted language contained in this paragraph appears to be an accurate quotation from page 9 of the Order attached at Ex. 16.

40.    Phillips admits that the parties disagreed about the effect of the modifier "substantially" in Claim 1 of the '798 Patent. Phillips admits that LGP has attached a true and correct copy of the November 22, 2002, Order as LGP Ex. 16, and that the language of that Order speaks for itself. Phillips admits that the quoted language contained in this paragraph appears to be an accurate quotation from page 10 of the Order attached at Ex. 16.

8

41.     Phillips denies this paragraph because he does not know why AWH made its decisions.  Phillips admits that in the motion attached as Ex. 41 AWH states that it was filing the motion in light of the Order of November 20, 2002, articulating the Court's interpretation of the disputed patent claims.  LGP Ex. 17 at page 1.

42.     Admit.

43.     Phillips admits that LGP Ex. 18 is a true and accurate copy of the response to the Patent lawsuit Defendants' motion to reconsider the order denying their motion for summary judgment, and admits that LGP has accurately quoted from page 1 of LGP Ex. 18.

44.     Phillips admits that LGP Ex. 18 is a true and accurate copy of the Response to the Patent Lawsuit Defendants' motion to reconsider the order denying their motion for summary judgment, and admits that LGP has accurately quoted from page 2 of LGP Ex. 18.

45.     Admit.

46.     Admit.

47.     Phillips admits the first sentence of this paragraph, and admits that he argued on appeal that the District Court erred in construing the claim terms baffle and substantially parallelepiped.  Phillips denies that these were the only issues raised on appeal.  *See*, Ex. A-2.

48.     Admit.

49.     Admit that LGP has accurately quoted from *Phillips v. AWH Corp.*, 363 F.3d 1207 (Fed. Cir. 2004).

50.     Admit.

51.     Phillips admits only that the Petition for Rehearing, at LGP Ex. 20, speaks for itself.

52.     Phillips admits that the Federal Circuit issued its *en banc* opinion on July 12, 2005, and that opinion may be found at *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005).  Phillips admits that the language of the Federal Circuit's *en banc* decision speaks for itself.  Phillips admits that the Federal Circuit opinion states: "As a preliminary matter, we agree with the panel that the

term "baffles" is not means-plus-function language that invokes 35 U.S.C. § 112, paragraph 6." *Id*. at 1311. "Because we disagree with the district court's claim construction, we reverse the summary judgment of noninfringement. In light of our decision on claim construction, it is necessary to remand the infringement claims to the district court for further proceedings." *Id*. at 1328. Phillips denies that the Federal Circuit expressly issued the holdings set out by LGP in this paragraph, and the rule to be drawn from the case is an issue of fact rather than an undisputed factual allegation.

53.    Admit.

54.    Admit.

55.    Phillips admits that at the Rule 16 hearing the Court set the case for trial to commence on February 27, 2006. Phillips denies that the Court engaged in any substantive decisions about the claims to be tried. LGP Ex. 22.

56.    Admit.

57.    Phillips denies that LGP has accurately quoted this provision of the Trial Preparation Order. *See*, LGP Ex. 23 at 3, ¶B.

58.    Admit.

59.    Admit.

60.    Admit.

61.    Phillips admits that on or about November 30, 2005, he sent Manthei a formal notice of termination prepared by LGP. *See* Counterclaim [Doc. #68] at ¶23.

62.    Phillips admits that the Contingency Fee Agreement with LGP was signed on or about December 9, 2005. LGP Ex. 25. Phillips admits that the effective date of the Contingency Fee Agreement was November 29, 2005. *Id*. Phillips denies that LGP commenced representing him on either of these dates, and instead alleges that LGP commenced representing him no later than early October, 2005. Ex. A-3.

63.   Phillips admits that the effective date of the Contingency Fee Agreement was November 29, 2005.  LGP Ex. 25, page 1.

64.   Phillips admits that attorneys Robert Payne and Donald Mollick filed entries of appearance in the Patent Lawsuit on December 15, 2005,

65.   Admit.

66.   Admit.

67.   Phillips admits that AWH filed a Trial Brief in the Patent Lawsuit on January 24, 2006 [Doc. #245], an accurate copy of which is attached as LGP Ex. 30.  Phillips admits that in Section 1 of that Brief, AWH argued that infringement of Patent Claim 1 had been resolved in AWH's favor and no longer an issue for trial.  *See*, LGP Ex. 30 at Section 1.

68.   Phillips admits that LGP filed a Reply to AWH's Trial Brief on February 8, 2006 [Doc. #260], an accurate copy of which is attached as LGP Ex. 31.  Phillips admits that in the Reply, LGP argued that "Claim 1 is and always has been an asserted claim" in the Patent Lawsuit.  LGP Ex. 31 at Section 1.

69.   Phillips admits that LGP filed a Reply to AWH's Trial Brief on February 8, 2006 [Doc. #260], an accurate copy of which is attached as LGP Ex. 31.  Phillips denies that in paragraphs 4-7 of that Reply (in fact, there are only 5 paragraphs in the Reply) LGP moved the Court to issue a new claim construction for the term "substantially parallel-piped."  LGP Ex. 31

70.   Philips admits that the Final Pretrial Order, an accurate copy of which is attached at LGP Ex. 32, provides that "Plaintiff claims direct and literal infringement or in the alternative under the doctrine of equivalents of claims 1, 21, 22, 24, 25 and 26 of his patent number 4,677,798 . . ." LGP Ex. 32 at Section 3. Phillips admits that the final Pretrial Order also included AWH's objection to the inclusion of Claim 1 in the Patent Lawsuit.  *Id*. at Section 4.

71.   Admit.

72.   Admit.

11

73.     Philips admits that the Final Pretrial Order signed by the Court on February 21, 2006, an accurate copy of which is attached at LGP Ex. 35, provides that "[t]he Court having ruled on February 13, 2006, that literal infringement of Claim 1 may not be asserted in the case by Plaintiff, Plaintiff claims direct and literal infringement of claims 21, 22, 24 and 26 or in the alternative under the doctrine of equivalents of said claims as well as Claim 1 of his patent number 4,677,798 . . ." LGP Ex. 35 at Section 3.

74.     Admit.

75.     Admit.

76.     Admit.

77.     Admit.  AWH's counsel finished this statement as follows: "To be in a position now would simply be unfair, prejudicial, and inconsistent, with their prior statement that Claim 1 was out of this case."  LGP Ex. 8 at Vol. I, 7:10-12.

78.     Admit.

79.     Admit.

80.     Admit.

81.     Admit.

82.     Admit.  The Court finished its response as follows:

So what I'm left with is a pretrial -- proposed pretrial order that was initially submitted to the Court that contained a rather conflated description of the claims to be asserted here that never was changed, and that the plaintiffs believed they were proceeding on equivalents and the defendants as to Claim 1 -- and the defendants believed they were not. You have not had a meeting of the minds here; and I agree with the defendants that to force them to go to trial with regard to a claim that they didn't understand that they were proceeding on would be unduly prejudicial.

LGP Ex. 8 at Vol. I, 10:5-15.

83.     Phillips denies that the language quoted in this paragraph was the next thing said by the Court.  Initially, Mr. Payne attempted to argue to the Court that LGP, by revising the draft Final

Case 1:07-cv-01723-WYD-CBS   Document 334   Filed 01/19/10   USDC Colorado   Page 13 of 89

Trial Order initially drafted by AWH's counsel, had provided proper notice to AWH's counsel that

a claim for infringement of Claim 1 under the Doctrine of Equivalents would be pursued at trial:

> And the draft that we received from defense counsel before this was a single line. This [revised draft] had numerous lines, so it was an obvious flag that we were suggesting a change in language and that the purpose for that change in language was to assert the Doctrine of Equivalents as to those claims.

*Id*. at 11:1-6. In response to this argument by LGP, the Court stated "[a]nd what I'm telling you is

there obviously was no meeting of the minds; and as a consequence" of that failure the Court

finished its response as quoted by LGP in paragraph 83. *Id.* at 11:7-16.

84.     Phillips denies that Payne made an argument that Phillips conceded a claim for

infringement of Claim 1 under the "Doctrine of Infringement." *See*, LGP Ex. 8 at Vol II, 55:22-

58:12. Phillips admits that Payne argued to the Court that Phillips had not waived any claim under

Patent Claim 1 under the Doctrine of Equivalents with respect to the term "substantially parallel-

piped."

85.     Denied. The Court granted the motion for reconsideration of the ruling, but, upon

reconsideration, denied to "change its conclusion" that Phillips had "conceded his ability to prove

infringement of Claim 1 under any theory." LGP Ex. 8 at Vol. V, 639:22-640:4. Phillips admits that

the Court issued a lengthy ruling on this issue from the bench that is found in the trial transcript

(LGP Ex. 8) at Vol. V. 631:1-640:5, and states that the Court's order speaks for itself. Phillips also

states that the Court based its decision to exclude a claim for infringement of Claim 1 under the

Doctrine of Equivalents on the fact that "[n]otably, at no time during this [Final Pretrial Conference]

hearing did Mr. Phillips [through his counsel LGP] contend that he could assert a claim of

infringement on Claim 1 based on the Doctrine of Equivalents." LGP Ex. 8 at Vol. V, 633:14-16.

86.     Phillips admits that the Court refused the claim for infringement of Claim 1 under

the Doctrine of Equivalents to proceed, but denies that the Court denied the Motion for

Reconsideration. LGP Ex. 8 at Vol. V, 639:22-640:4.

87.     Admit.

88.     Phillips admits that the claim for infringement of Claim 1 under the Doctrine of Equivalents was disallowed by the Court on the grounds set forth by the Court at pages 631:1-640:5 of the trial transcript.  *See*, LGP Ex. 8.  Phillips admits that the infringement issues at trial were, therefore, limited to infringement of Claims 21, 22, 24 and 26 of the '798 Patent.

89.     Admit.

90.     Phillips admits that after conducting an evidentiary hearing in the middle of trial the Court issued a lengthy order from the bench to strike his expert testimony concerning design, construction and infringement of AWH's seven jails because there had not been a disclosure of his visits to those jails, nor of the fact that his observations at those visits was a basis for his opinions. LGP Ex. 8 at Vol. IV, 564:14-571:14.

91.     Phillips admits that the Court instructed the jury to disregard portions of his testimony.

92.     Phillips admits that after hearing argument in the middle of trial the Court issued a lengthy order from the bench to strike portions of Wirkler's expert testimony concerning design, construction and infringement of AWH's jails because there had not been a disclosure that Wirkler was going to rely, in part, on certain exhibits to support his opinions.  LGP Ex. 8 at Vol. V, 750-21-754:12.

93.     Phillips admits that the Court instructed the jury to disregard portions of Wirkler's testimony.

94.     Phillips admits that on February 8, 2006, two weeks after the January 26, 2006 deadline for the joint submission of jury instructions, LGP filed a motion to tender a proposed jury instruction on the "entire market value" damages theory.  LGP Ex. 39.

95.     Phillips admits that the damages instructions, including instructions relating to the "entire market theory," the computation of a royalty, and the sale of collateral goods were addressed

at length during the charging conference taking place on trial day 8.  LGP Ex. 8, Vol. VIII, 1189:18-1201:22.  Phillips disagrees that the Court expressed an opinion at that time to the applicability of that theory.  *Id.*

96.     Phillips admits that the Court, after hearing the parties concerning the damage instructions including the "entire market theory" instruction, at the charging conference stated:

> We're going to pass on these instructions at this time. I want an instruction that covers what the various approaches to measuring damages is and the mechanism by which the jury does that. You may disagree and I'll rule on what we're going to submit to the jury, but we're not going to have this piecemeal, sort of pie-in-the-sky approach.  And I'll need it by 5:00.

LGP Ex. 8, Vol. VIII, 1201:16-22.

97.     Phillips admits that the revised damages instruction was sent by the parties to the Court on the evening of March 8, 2006.  Phillips denies that AWH stipulated to the submission of the entire instruction to the jury.  Rather, AWH specifically objected to that portion of the instruction incorporating the "entire market theory" "on the grounds that it is not supported by the evidence in this case and should not be included in the instruction."  LGP Ex. 40 at page 1.

98.     Phillips admits that the damages instruction submitted to the Court on March 8, 2006, included the language quoted in this paragraph. Phillips denies that AWH stipulated to the submission of the quoted portion of the proposed instruction as the "Defendants object[ed] to the third theory of recovery on the grounds that it is not supported by the evidence in this case and should not be included in the instruction."  LGP Ex. 40 at page 1.

99.     Phillips admits that the Court rejected the "entire market theory" instruction, stating in part:

> Mr. Phillips was not a competitor of the defendants, Mr. Phillips was not manufacturing this product, and there is no evidence that Mr. Phillips could have added the toilets and other auxiliary units to the patent, as did the defendants.

>                        *        *        *
> The Court therefore concludes that since the facts in this case do not support the application of the entire market value concept because the parties were not

competitors, each able to add products or goods to the invention, the entire instruction is inappropriate and is excluded.

LGP Ex. 8, Vol. IX, 1223:12-1224:2.

100.    Admit.

101.    Admit.

102.    Phillips admits that the Court substituted a pattern jury instruction on patent damages, and that the instruction given to the jury as Number 25 is found at Vol. IX, 1254:22-1256:23 of the trial transcript.  Relevant portions of the transcript not included in LGP's Ex. 8 are attached as Phillips' Ex. A-4.  *See also*, LGP Ex. 37 at Instruction 25.

103.    Admit.

104.    Admit.

105.    Phillips admits that while the jury did return the verdict referenced at LGP Ex. 41 and 42, the Court ultimately granted the Motion for Judgment as a Matter of Law, pursuant to Fed. R. Civ. P. 50(a) ("JMOL"), made by AWH at the conclusion of Phillips' case in chief at the Patent Lawsuit.  Ex. A-4 Vol. VII, 1014:4-1034:14; LGP Ex. 49 at 21-22.

106.    Admit.

107.    Admit.  *See*, Ex. A-4 at Vol. X, 1340:20-23.

108.    Phillips admits that on April 20, 2006, AWH filed a Renewed Motion for Judgment as a Matter of Law Pursuant to Fed.R.Civ.P. 50(b) [Doc. #304 and #305].  Phillips clarifies that on May 2, 2006, LGP filed a Motion to Strike AWH's Renewed Motion for a JMOL [Doc. #309], and on May 10, 2006, LGP filed Phillips' Response to the Renewed Motion for JMOL [Doc. #312].

109.    Phillips admits that he retained Duane Morris, LLP ("DM") to represent him with regard to the Patent Lawsuit in the fall of 2006, after the briefing on the Renewed JMOL motion was completed, and after the Court conducted its post-trial evidentiary hearing on June 6, 2006.  Ex. A-5 16:21-19:1, 24:11-25:4.

110. Admit.

111. Phillips admits that he discharged LGP before the Court ruled on the pending Motion for JMOL, and admits that the date of the discharge was on or about November 27, 2006.

112. Admit.

113. Phillips admits that on December 20, 2006, the Court granted AWH's Motion for JMOL made at the close of Phillips' Case and denied as moot AWH's written Renewed Motion for JMOL. LGP Exhibit. 49 at 21-22. Phillips admits that the Opinion and Order attached as LGP's Exhibit. 49 is an accurate copy of the Court's Order of December 20, 2006, and that the terms of that order speak for themselves. LGP Exhibit. 49.

114. Admit.

115. Admit.

116. Admit.

117. Phillips admits that LGP has accurately quoted language from page 16 of Exhibit.49. Phillips also advises the Court that in the previous paragraph of Exhibit. 49, the Court noted that: [f]or this reason [the failure to preserve in the record the Exhibits created at trial by Phillips revealing AWH's end closures] alone, the Defendants would be entitled to judgment on the end closure issue as it relates to the last four jails." LGP Exhibit. 49 at 16.

118. Phillips admits that there was an offer of at least $4 million made by AWH prior to the Court's entry of the December 20, 2006, JMOL order, and that he had authorized DM to accept an offer of at least $4 million. Exhibit. A-6 at 37:8-18, 51:2-7.

119. Phillips admits that on December 22, 2006, AWH's attorneys notified DM that AWH was withdrawing its offer to settle. LGP Exhibit. 51.

120. Phillips admits that after the Court granted the JMOL and dismissed all of his claims against AWH, DM negotiated an agreement on December 29, 2006, by which AWH paid Phillips $2.55 million. Doc. #68 at page 13, ¶33.

121.    Phillips admits that the Notice of Lien was filed on November 27, 2006, and that LGP filed a claim against him to enforce the lien or collect a fee on April 20, 2007.  LGP Exhibit. 54.

122.    Phillips admits that on September 4, 2008, the Court in Case Number 97-cv-212 issued an order declining to exercise jurisdiction over LGP's attorney fee claims, Manthei's attorney fee claims and Phillips' compulsory counterclaims.  LGP Exhibit. 55  at page 10.

123.    Admit.

124.    Admit.

125.    Phillips admits that his compulsory counterclaims against LGP in this case were filed on September 18, 2008, 14 days after the Court in Case Number 97-cv-212 dismissed his compulsory counterclaims against LGP in that case for lack of jurisdiction.  LGP Exhibit. 55 at page 10.

126.    Phillips admits that ¶52 of his counterclaim in this case sets forth that "LGP, and its attorneys Payne and Mollick, breached the duty of care owed to Mr. Phillips in a number of ways, including but not limited to" the 11 Examples quoted by LGP in this paragraph. [Doc. #68 at ¶52].

127.    Phillips admits that he filed compulsory counterclaims on April 14, 2008 in Case Number 97-cv-212 (while that case was stayed pending resolution of jurisdictional matters), that an accurate copy of that counterclaim is attached as LGP's Exhibit. 56, and the counterclaim speaks for itself.  LGP Exhibit. 56.

128.    Admit that LGP appears to have accurately quoted Interrogatory Number 3 in LGP's Exhibit. 57.

129.    Admit that LGP appears to have accurately quoted a portion of the second paragraph of the Response to Interrogatory Number 3 in LGP's Exhibit. 58.  Phillips denies that this is the complete response.  *See*, LGP Exhibit. 58 at pages 6-7.

130.    Admit that LGP appears to have accurately quoted a portion of the second paragraph of the Response to Interrogatory Number 1 in LGP's Exhibit. 58.  Phillips denies that this is the complete response.  *See*, LGP Exhibit. 58 at pages 3-4.

131.    Admit that LGP appears to have accurately quoted Interrogatory Number 4 in LGP's Exhibit. 57.

132.    Admit that LGP appears to have accurately quoted a portion of the Response to Interrogatory Number 4 in LGP's Exhibit. 58.  Phillips denies that this is the complete response. *See*, LGP Exhibit. 58 at page 7.

133.    Phillips denies that the quotations in this paragraph are found at LGP's Exhibit. 15, at 83:11-13.  Phillips admits that this appears to be an accurate quotation from pages 86:11-87:13 of LGP's Exhibit. 15.

134.    Phillips denies that the quotations in this paragraph are found at LGP's Exhibit. 15, at 106:20-108:18.  Phillips admits that this appears to be an accurate quotation from pages 109:19-111:17 of LGP's Exhibit. 15.

135.    Admit.

136.    Admit.

137.    Phillips denies that the quotations in this paragraph are found at LGP's Exhibit. 15, at 147:24-149:16.  Phillips admits that this appears to be an accurate quotation from pages 150:22-152:13 of LGP's Exhibit. 15.

138.    Phillips denies that the quotations in this paragraph are found at LGP's Exhibit. 15, at 150:16-151:5.  Phillips admits that this appears to be an accurate quotation from pages 153:14-154:1.

**B.      STATEMENT OF ADDITIONAL DISPUTED AND UNDISPUTED FACTS – The Family Trust & The 1991 Bankruptcy**

1.      The Honorable Ronald Schultz, a Larimer County Colorado County Court Judge since 1974, is Trustee of the Edward Phillips Family Trust, and states that the Trust instrument was signed by him and Phillips in June, 1989.  Exhibit. A-7 at 20:14- 21:1, 63:15-17.  The Trusts' assets included Phillips three patents, including the '798 Patent.  Exhibit. A-7, at 21:19-25, 39:5-15.

19

2.      Schultz granted Phillips authority, in writing, to find and take advantage of business opportunities for the Patent.  *Id*. at 22:16-23:8.  Schultz authorized Phillips to bring an infringement lawsuit.  *Id*. 56:1-24.  In the course of that work, Phillips and Schultz communicated regularly about the use of the Patents *Id*.  The communications included updating Schultz on the Patent Infringement Lawsuit.  *Id*. at 272-12.

3.      If Schultz, in his role as Trustee of the Trust, had ever been advised by Manthei or LGP that it was necessary for the Trust to join as a party in Patent Lawsuit, he would have agreed to do so on behalf of the Trust.  Exhibit. A-8 at ¶3.

4.      If Schultz, in his role as Trustee of the Trust, had ever been advised by Manthei or LGP that it was necessary for the Trust to assign to Phillips the patents and/or the right to sue for past infringement of the Patents, he would have agreed to do so on behalf of the Trust.  *Id*.

5.      LGP possessed a copy of the Transcript of the August 14, 1991, Bankruptcy Creditors' Meeting (attached at LGP Exhibit. 4) in its legal file at the time it represented Phillips in the Patent Lawsuit.  When LGP obtained the file, it had to "reconstruct" the entire file, reorganize the file, and review the file to be sure that it was prepared for trial.  Exhibit. A-9  at 20:18-25, 34:13-35:14.

6.      In spite of the fact that LGP had numerous staff members and lawyers devoted to the task, spent a considerable amount of time on the task, and was aware of the Trust being mentioned in correspondence between Phillips and AWH in the late 1980s, Payne testified that no one in his office ever noticed a blue file labeled "BANKRUPTCY" in its files, and that the information was only found by LGP's malpractice lawyers once LGP was sued.  *Id* at 35:15-36:5, 36:20-37:10, Exhibit A-10.

7.      In spite of being aware that there were references to the Trust in communications between Phillips and AWH in the 1980s, *see, for Example,* Exhibit A-11 (September 18, 1990, letter from the Phillips Family Trust, signed by Phillips, to AWH advising that the Trust had authorized

Phillips not to renew the parties' agreement or accept AWH's offer to purchase the Patent), LGP never looked in its file for information about ownership.  Exhibit A-9 at 36:25-37:10.

8.      LGP was aware that AWH had never challenged the ownership of the '798 Patent, and had abandoned that defense in the Patent Lawsuit, and that the issue was not a part of the trial. Exhibit A-9 at 23:8-13, 27:13:16.

9.      Apparently AWH was aware, or should have been aware, of the Trust's role in the ownership of the Patent in light of their communications with Phillips.  *See,* Exhibit A-11.  The Complaint in the Patent Lawsuit does not state that Phillips was the owner of the Patents, but instead states only that the Patents were issued to Phillips.  LGP Exhibit 9 at ¶ 2.  Nevertheless, AWH did not challenge the ownership of the Patent as a defense in the Patent Lawsuit regardless of this knowledge. *See, for example*, LGP Exhibit 35 at Section 3 and Section 4 ¶1; Exhibit A-4 at 1241:3-14 (Jury Instruction 13); and LGP Exhibit 42 (Verdict Form) at Questions 1 and 2.

         **– Phillips' 1993 Injury**

10.     In January, 1993, Phillips suffered significant injuries in an explosion, including hydrogen cyanide poisoning that left him with a brain injury and seizure disorder.  Exhibit A-7 at 119:2- 120:2.  The injuries were acerbated in a fall in February 1993.  *Id.*  As a result of his injuries Phillips describes that he has "trouble staying on the subject [and cannot] concentrate consistently [because he has] little seizures that break up [his] lines of thought." *Id.*  Phillips suffered from that condition during the entire period of the Patent Lawsuit, and continues to suffer from that condition now. *Id*. at 120:18-23.

11.     Phillips' condition was significant enough that in September, 1997, he responded to a Motion for Summary Judgment filed by AWH on the basis that Phillips' trade secrets claim was time barred by asserting in his Response that "[b]ecause of two traumatic brain injuries, [Phillips] was not mentally competent from January, 1993 until the spring of 1996."  Exhibit A-12 at page 7, ¶ 15.  In support of the Response, Manthei had Phillips prepare an Affidavit stating that because of

his 1993 injuries he "was unable to do anything in pursuit of any claim [he] may have had against [AWH] from January, 1993, until the spring of 1996 when I recovered enough mental capacity to work with legal counsel." *Id*. At Response Exhibit 1, ¶ 10 (although the Response contains a number of its own Exhibits, only its Exhibit 1 is relevant to this allegation and is, therefore, the only one attached here).

12.     Through Manthei, Phillips submitted his initial Expert witness disclosure on or about September 23, 1997.  LGP Exhibit 11.  At that time, Phillips had already been deposed as a fact witness over five days from June through September, 1997.  On or about  November 6, 1997, Phillips was deposed on his Expert opinions.  Exhibit A-13.  In that deposition, Phillips testified that he had inspected the jail in Forsyth County North Carolina (which is, not coincidentally, where AWH is headquartered) but had not visited any of the other jails.  *Id*. at 59:25-61:4.  Following AWH's disclosure of Experts, Phillips supplemented his report on January 6, 1998.  LGP Exhibit 13.  Phillips' Expert deposition, in which he testified that his opinions were based on documents and drawings provided by AWH in discovery rather than on his visits to jails and the documents he obtained in those visits, was concluded on January 13, 1998. Exhibit A-14.

13.     Phillips' written Expert disclosures and Expert deposition testimony, all completed by January 13, 1998, could not have been based on his jail visits and the documents obtained in those visits because Phillips did not go to inspect all of AWH's infringing jails until March or April of 1998.  Exhibit A-4 at 537:21-538:17.  A review of the basic chronology of the case, the expert witness disclosures, and the Expert depositions, would, therefore, establish that the March or April 1998 jail visits could not have been identified as an original basis for Phillips' opinions, even if the information learned at the subsequent visits confirmed those opinions.

14.     A review of Mr. Wirkler's written Expert disclosures and deposition would have revealed that Wirkler did not identify Trial Exhibit 3 (Exhibit A-15) as a basis for his opinions, even if that Exhibit supported his opinions.  LGP Exhibit 12, Exhibit A-4 at 654:24-655:18.

### – Chronology following the *Markman* Order

15.     Although discovery in the case ended in late 1997, *see*, LGP Fact Statement 27, the *Markman* order was not entered until November 22, 2002.  LGP Exhibit 16.  No further requests for discovery or revisiting case deadlines were made after the *Markman* Order, and, instead, the trial court case was terminated by the confessed judgment on January 22, 2003.  LGP Exhibit 19.  Following the entry of judgment, the dispute worked its way through the appeals process until the Federal Circuit issued its mandate remanding the case on August 2, 2005.  LGP Exhibit 21.  Although more than two and a half years had passed on the calendar, only two months had passed in trial court time from the day of the *Markman* Order to the date of remand.

### – LGP's Entry Into the Case

16.     Payne testified in the Bankruptcy Court that his firm did not even begin discussing the case with Phillips until "either late October or early November" of 2005, Exhibit A-9 at 19:21-20:2.  In reality, LGP first solicited Phillips business and began working on the case no later than September 19, 2005 – less than two weeks after the Court's post remand Rule 16 Conference on September 8, 2005.  Exhibit A-16, LGP Fact Statement ¶54, Exhibit A-17 at ¶2.

17.     Rather than not having contacted Phillips until November, 2005, LGP was in fact actually keeping time for work spent on Phillips case by at least October 3, 2005.  Exhibit A-3 at pages 1Phillips27910-12.

18.     In order to induce Phillips to hire the firm, LGP, their lawyers Bob Payne and David LaRiviere, made a number of statements to Phillips that were important in Phillips' decision to work with LGP.  One important statement that was made early by Payne and LaRiviere was that Payne had been the main lawyer in many complicated patent infringement jury trials not only in California but also in Alaska, Colorado and around the county. Exhibit A-17 at ¶3.  LGP told Phillips that being the main trial lawyer in so many patent infringement cases made Payne a national Expert in actually trying patent infringement cases.  *Id*.  Payne and LaRiviere told Phillips that Payne would

be the main lawyer in the case if he had LGP work for him, and that Payne would be in charge of handling the important witnesses at trial, including Phillips, if he had to testify. *Id.* LGP told Phillips in the early conversations that LaRiviere would back Payne up at trial, and that other lawyers in the firm would also help with the case. *Id.*

19.     LGP never told Phillips, when Phillips was discussing whether to work with the firm, that Don Mollick would become one of the main lawyers on the case, and would be responsible for questioning Phillips if he had to testify at trial. *Id.* Phillips did not know that Mollick was going to be the attorney questioning him at trial until the second day of Phillips' testimony when Mollick took over for Payne. *Id.*

20.     If Phillips had known that Payne did not have the amount of Experience being the main lawyer at patent infringement jury trials that he said he did, that Payne would not be the lawyer in charge of questioning Phillips at trial, that LaRiviere would not be at trial, or that Mollick would be in charge of questioning him, he would not have chosen LGP to be his lawyers. *Id.*

21.     In written discovery, LGP was asked to:

> Identify each jury trial at which either Robert Payne or Donald Mollick acted as either lead or assistant counsel at any time prior to the trial of the Patent Lawsuit. For Purposes of this Interrogatory, "identify" includes the case name, the case number and Court, the identity of the party represented by either Robert Payne or Donald Mollick, the date of the trial, the general nature of the case (i.e., breach of contract, product liability, or patent infringement), the outcome of the case, and, if a judgment was entered, the amount of the judgement (sic).

LGP's response suggests that while Payne has been counsel in many patent infringement cases, prior to the Phillips case he had not served as lead counsel at the actual trial of any of these cases:

> Robert Payne has served as lead counsel in over 30 filed patent infringement cases, in various federal district courts, including Northern District of California, Central District of California, Eastern District of Texas, Western District of Washington, Arizona and Colorado. Mr. Payne served as lead counsel in PHILLIPS v. AWH in the United States District Court for the District of Colorado. Other jury trials handled by Mr. Payne include BELLE HAVEN v. CAZ DEVELOPMENT a business litigation matter involving claims of breach of guaranty and bad faith denial of contract. The matter resulted in a $3.3 million jury verdict in favor of Mr. Payne's

24

client in the Santa Clara County Superior Court in 1989.  Additionally, Mr. Payne has served as co-counselor second chair in other cases, including the SHERATON PALACE case - also involving business litigation, heard in San Francisco County Superior Court, California, also in the early 1990's.  Mr. Payne has also worked as lead counsel on matters that were tried to the Court: MAILMAN v. SCHILL CONSTRUCTION, Case No. CW 319756 involved an allegation of breach of contract resulting in a favorable verdict for Mr. Payne's client in San Mateo County Superior Court, California.  The case was filed in 1987 and was resolved in the late 1980's.  In the TOWN OF HILLSBOROUGH case Mr. Payne served as lead counsel in the case which was heard in San Mateo Superior Court in the mid to late 1980's.  Mr. Payne was first chair in a trial labeled BREDENBECK v. SUNFISH which resulted in a favorable verdict for his clients in San Mateo County Court, California in the early 1980's.  Mr. Payne tried one other trial to the Court as second counsel, in the mid-to-late 1980's.  This case is PABST ENTERPRISES v. TARTARIC involving business and commercial real estate litigation which resulted in a favorable verdict for Mr. Payne's clients in San Mateo Superior Court, California.

Exhibit A-18 at Response to Interrogatory Number 6.

22.    LaRiviere did not appear at or assist at Phillips' trial.  *See*, Exhibit A-4 at 1-2, 50-51, 265-266, 447-448, 629-30, 791-92, 926-27, 1122-23, and 1219-20.

23.    Notably, by October 5, 2005, LGP was already reviewing the briefing in the case, as well as reviewing the "Expert Report Summaries regarding deficiencies and usability." *Id.* at 1Phillips27910.  LGP's own billing reveals that by early October the firm was already referring to Mr. Phillips as its "client" and analyzing issues related to a stay of the case, and the effect of the Federal Circuit opinions on the claims in the case. *Id.*

24.    Ultimately, afer spending two months reviewing the case and preparing to replace Manthei as counsel, LGP entered its fee agreement with Phillips effective November 29, 2005. *Id.* at 1Phillips027917, LGP Exhibit 25.  Even then, LGP did not enter its appearance in the case for another two weeks on December 15, 2005.  LGP Exhibit 26 and 27.

25.    Once LGP appeared in the case it did nothing to try to remedy the problems that it now alleges plagued the case.  AWH, on November 15, 2005, filed a Motion to Stay the case pending an effort to obtain review of the Federal Circuit opinion in the United States Supreme Court.  Exhibit

A-19. This stay would have led to a continuance of the February 2006 trial date, which would have allowed LGP more time to become comfortable with the case file and issue. Nevertheless, rather than agreeing not to oppose the motion, or even joining the motion, LGP filed an opposition to the Motion for Stay on December 13, 2005. Exhibit A-20.

26.     Yet, at the same time LGP opposed AWH's motion to stay, it filed on December 15, 2005, its own opposed motion for a continuance in order to give itself more time to "prepare for trial and move forward on the case." Exhibit A-21.

27.     LGP also filed a motion to Conclude AWH's damages Expert from testifying at trial, rather than seeking to find a way to add their own additional Experts or, at minimum, disclose additional bases for Phillips' and Wirkler's opinions. Exhibit A-22. In opposing the Motion on January 17, 2006, counsel for AWH made a telling offer for LGP to depose the Expert and thus avoid any prejudice in the case: "Further, more than five weeks remain until trial and AWH could make Mr. Levko available for deposition, should plaintiff choose to take such deposition and cure any alleged prejudice or surprise." Exhibit A-23 at page 6. In reply, LGP argued that AWH's effort to supplement its Experts before trial was "untimely and prejudicial to the Plaintiff." Exhibit A-24 at page 6. Even as late as mid-January, AWH had revealed its position that errant Expert disclosures could still be cured to avoid prejudice.

28.     A review of the billing for October 2005 through February 2006, and the docket sheet for the Patent Lawsuit for December 2005 through February 2006 reveals that LGP, in spite of having thought about the deficiencies of Phillips' Expert witness disclosures since the beginning of October did not make any effort to formally or informally amend the bases for Phillips' and Wirkler's opinions, and then offer to make the Exhibits available for additional deposition to cure any surprise or prejudice. Exhibit A-25, Exhibit A-26.

        **– Trial and AWH's JMOL**

29.     Payne and Mollick conducted the trial from February 27, 2006, through March 10, 2006. LGP Statement of Fact at ¶74. At the close of Phillips' case on the sixth trial day, AWH's

counsel moved for a JMOL. Exhibit A-4 at 979:1-3. Before AWH's counsel even argued its motion, the Court advised him that it would not rule on the motion until after trial because of the extraordinarily confused and objection riddled nature of LGP's trial presentation:

> Now, I know that you want to make a Rule 50(a) motion, and I want to give you the opportunity to make that record; but let me tell you in advance I will not be ruling on it. I will Exercise my discretion to consider the record as a whole as of the moment that the plaintiff rested to consider whether dismissal of any part of their claim is appropriate under Rule 50(a). And I do so because the manner in which the evidence has come in in this case is extraordinarily confused, and there have been numerous evidentiary rulings that have required the striking of portions of the evidence and precluding the jury from considering certain evidence. Quite frankly, until I have a complete and correct transcript, I cannot determine what the record is as of the motion -- as of the time that the plaintiff rested.

*Id*. at 1011:15-1012:3.

30.     Ultimately, the Court granted the JMOL on December 20, 2006 (LGP Exhibit 49), effectively holding that the case would have been dismissed by the Court at the close of Phillips' case, rather than after the jury returned a verdict in Phillips' favor, if the Court had been able to make sense of LGP's presentation at that time. LGP Exhibit 49 at page 21.

31.     At the very commencement of trial, LGP raised its argument that Phillips should be allowed to pursue a claim of infringement for Patent Claim 1 under the Doctrine of Equivalents because it had listed that claim on the Final Pretrial Order without response from AWH. Exhibit A-4. The Court denied the ability to proceed on the claim, stating that:

> So what I'm left with is a pretrial -- proposed pretrial order that was initially submitted to the Court that contained a rather conflated description of the claims to be asserted here that never was changed, and that the plaintiffs believed they were proceeding on equivalents and the defendants as to Claim 1 – and the defendants believed they were not. You have not had a meeting of the minds here; and *I agree with the defendants that to force them to go to trial with regard to a claim that they didn't understand that they were proceeding on would be unduly prejudicial.*

*Id*. at 10:5-15.

32.     LGP later moved the Court to reconsider its ruling.  LGP Statement of Facts at ¶79. While the Court granted the Motion to Reconsider the ruling, it did not change its order.  As part of its analysis in declining to allow Phillips to present a claim of infringement under Patent Claim 1 under the Doctrine of Equivalents, the Court held: that"[n]otably, at no time during this [Final Pretrial Conference] hearing did Mr. Phillips [through his counsel LGP] contend that he could assert a claim of infringement on Claim 1 based on the Doctrine of Equivalents." LGP Exhibit 8 at Vol. V, 633:14-16.  The Court concluded that nowhere in the record had LGP given "notice to the Court that a party intends to pursue a particular claim at trial." *Id*. at 638:22-23.

33.     After losing Claim 1 at the beginning of trial, LGP was left with its evidence to prove infringement of Claim 21, Claim 22, and its dependent claims 24 and 26.  LGP Statement of Facts at ¶88.  Proving these claims required the testimony of Phillips and Wirkler as LGP had offered no other evidence on the patent term "end closure" – which was a necessary element of Claims 22, 24 and 26 – or "impact resistance" – a necessary element of Claim 21.

34.     Payne initially conducted the critical direct Examination of Phillips.  Exhibit A-4 at 89:8.  By agreement of the parties, and due to Phillips' physical limitations, his testimony was conducted over the course of three days.  *Id*. at 42:25-45:8.  Following the first break in Phillips' testimony, Mollick took over the Examination with a warning by the Court that no other changes would be permitted.  *Id*. at 148:5-149:8.

35.     Phillips was not informed that Mollick was going to take over the quetioning until that day.  Exhibit A-17 at ¶3.  Phillips had not prepared his testimony with Mollick, and did not know how Mollick would handle the Examination.  *Id*.  While Payne's time entries reflect that he reviewed the multiple volumes of Phillips' deposition testimony Exhibit A-25 at 1P027942-3on, January 29 - 31, 2006, there is no indication that Mollick ever read the transcripts of Phillips' Expert depositions before conducting the Examination of Phillips at trial, and there is no indication that Mollick ever met with Phillips to prepare his trial testimony before the trial.  *See* Exhibit A-25from 10/31/05 through 2/28/06.

36.     As a result of being unprepared for the Examination, Mollick offered substantial portions of Phillips' opinion testimony that AWH's seven jails infringed the Patent based on Phillips' visits to those jails, and materials he obtained at those visits.  As an Example, when Mollick was questioning Phillips on the issue of whether the "end closures" in the first three jails infringed on the end closures in the Patent, Mollick responded to an objection by accepting a suggestion made by the Court that the opinion was based on an inspection of the jails:

Q. And have you visited Hart?

A. Yes.

Q. Did you see any steel plate and inner and outer walls?

A. Yes.

Q. Did they define end closures?

A. Yes.

\*     \*     \*

Q. What did you see there?

A. Well, let's see. We saw the exterior of the jail. We toured the exterior, the interior. We spent a day there looking at the inside of the jail, and we inspected it closely. We took pictures. We looked at drawings that they provided us, and we also had the opportunity to closely inspect in between the cells and up on top of them.

Q. Did you see the end closures?

A. Sure. Yes, sir.

Q. Can you point out the end closures on the drawing?

A. There is two end closures where the two modules come together, so I'm going to circle both of them.

\*     \*     \*

Q. Now, on the drawings, how are the end closures formed?

MR. FISCHER: Objection, your Honor. This is either lack of foundation because he wasn't there at the -- well, there is no foundation that he was there at the manufacturing process to know how they were formed or (2) it's opinion testimony that is outside the scope of any opinion that he's been proffered for in this case.

THE COURT: Mr. Mollick, are you asking this witness to testify based on the drawing, or are you asking him to testify based on his inspection?

> **MR. MOLLICK: On his inspection**.
>
> THE COURT: All right. I overrule the objection. Mr. Phillips, limit your testimony to what you saw, not the drawing.

Exhibit A-4 at 285:20-287:12 (emphasis added).  Using this approach, Mollick offered critical opinions concerning infringement based on Phillips' jail inspections.

37.     AWH objected repeatedly to Phillips offering opinions based on jail visits, and materials obtained at those visits, as the visits had not been disclosed as a basis for Phillips' testimony.  *See*, *id.*, at 271:9-272:10.  AWH also moved for sanctions, including the sanction of dismissal, based on LGP offering Phillips' testimony predicated on the jail visits and materials obtained on the visits without ever disclosing that basis before trial.  *Id.* at 272:7-10, 381:16-386:4. When the Court asked AWH's counsel how it had been prejudiced by the failure to disclose, if any, counsel responded:

> We have been prejudiced, your Honor, because we came into this trial assuming that Mr. Phillips' testimony was going to be based entirely upon his review of documents in this case and that the necessary linking up, if there was going to be any, was going to be done by other witnesses, certainly not by Mr. Phillips. And the basis of his testimony, we had no opportunity to depose him about his Expert testimony with regard to the factual basis -- the bases upon which he was relying in order to form his Expert opinion in this case.  We have been prejudiced because his entire testimony this morning based upon that is a surprise.

*Id.* at 382:22–383:6.  LGP argued that AWH had, in fact, been given knowledge that Phillips would base his testimony on the jail visits satisfying the disclosure requirements.  *Id.* at 383:11-385:10. Additionally, in spite of the fact that Mollick had stated on a number of occasions during the presentation of testimony that Phillips was basing testimony on his inspection of jails, he argued to the Court that the none of Phillips opinion was "based on the personal inspection."  *Id.* at 385:11-20. In light of the disputes over disclosure, the Court conducted an evidentiary hearing on AWH's sanction motion on the fourth day of trial, after Phillips had completed testifying.  *Id.* at 386:2-4.

38.     After the Court conducted its hearing, it issued a sanctions order that it would instruct the "jury that they are to understand all opinions given by Mr. Phillips to be totally unrelated to anything he saw at the prisons and unrelated to any documents he obtained at the prisons." *Id* at 570:15-20.  In reaching that decision the court made the following express findings:

> I find based on the evidence that (1) there was no supplemental Expert report that disclosed Mr. Phillips' visitations to the prisons excepting Forsyth and Lee in April -- I'm sorry -- March and April, 1998.
>
> *              *              *
>
> I further find that Mr. Phillips did, indeed, rely upon his physical inspection of the prisons in the formulation of his supplemental 2005 Expert report. He so testified a few minutes ago, and that testimony is consistent with the testimony that he gave earlier in this trial. And he's sitting and nodding his head right now. As he says, he's a visual person, he considered those inspections -- his inspection and what he saw in those prisons in formulating his opinion.
>
> I further find based on the record before me that the defendants were surprised at the time of trial with learning that Mr. Phillips had visited these prisons other than Lee and Forsyth and they were surprised by his testimony that he relied upon those -- what he saw during those inspections in formulating his opinions.
>
> I further find that the presentation of the evidence during his direct Examination was extraordinarily confused. It was difficult and still is difficult for me even upon review of the record to ascertain what was an Exhibit opinion and what was a lay observation.
>
> Counsel attempted to separate those and clarify that for the record. That effort was successful in some degrees but not in others; and it was compounded by the fact that Mr. Phillips alternated between a discussion of what he saw and what his opinion was.

*Id*. at. 566:7-567:25

39.     Finding that LGP did not disclose the basis for Phillips' opinion before trial, the Court then examined a number of factors to determine if a sanction was appropriate.  The Court's analysis focused on the fact that unlike a situation where an untimely disclosure could still be cured by allowing further deposition or a reciprocal designation of additional evidence by the other party, no such remedy was available where LGP elected to disclose the basis for Phillips' opinion during the trial:

The first is the prejudice or surprise to the party against whom the information is offered. Here, I have already found that the defendants were surprised at trial by the reference to the inspection and the linkage of that inspection to the Expert opinions.

Next exhibit, I am required to analyze the ability of the party to cure the prejudice. Because this information was presented at trial, the customary cure of allowing another deposition of the Expert is not available, and the ability to conduct their own inspections of these prisons with appropriate Expert witness in tow is not available. Thus, the usual process of curing this prejudice is not available to the Court.

I turn then to the third factor, which is the Exhibit to which introducing the information will disrupt the trial. And this is usually considered in the cont Exhibit of a late designation of a witness or a late designation of some information. It's really not applicable here. The information has already been presented to the jury.

And the fourth factor is the moving party's bad faith or willfulness. I have no evidence before me to establish bad faith or willfulness. Sloppiness, yes. A failure to disclose, yes. But no evidence of bad faith or a malicious intent.

*Id*. at 569:5-570:2.

40.     The Court then instructed the jury that

You have heard extensive testimony by Mr. Phillips about his inspections of various prisons and his opinions about the similarities between their construction and his patent. You have also heard testimony that may suggest that he did not visit some or all of the prisons he claims to have visited. Whether he visited the prisons and which prisons he visited, if any, is for you to determine. However, you must disregard any of Mr. Phillips' opinions if the opinion was based in any way upon his inspection of a prison or any document obtained from a prison.

*Id.* at 574:8-17.

41.     Later at trial LGP was sanctioned again for Mollick having the other infringement witness, Norman Wirkler, offer opinion based on Trial Exhibit 3 in spite of the fact that this basis was never disclosed:

Again, we are faced with a request by the defendants for imposition of sanctions for failure to comply with Rule 26 in the supplementation of an Expert report or a deposition of an Expert. Here it appears that the Expert, Mr. Wirkler, relied upon what has been marked and received as Exhibit 3 in formulation of his opinions with regard to the Lee, Forsyth, Pulaski, and Mahoning prisons.

*       *       *

32

[In considering whether to issue a sanction the] first factor requires the Court to consider the prejudice or surprise to the party against whom the information is offered. The surprise here is that for the first time at trial, reference is made to Exhibit 3 as the basis of the opinion with regard to Forsyth, Pulaski, Mahoning, and Lee. This deprived the defendants of the opportunity to depose Mr. Wirkler with regard to the basis of his opinions and the documents he reviewed and considered.

The second factor that I consider is the ability of a party to cure the prejudice. There is no cure at this point because we can't stop the trial, take a deposition, let the defendants inquire as to what the basis of this opinion was and what drawings were reviewed and how he interpreted those drawings. Instead, all of that information has already been presented to the jury.

The third factor is the Exhibit to which introducing the information will interrupt the trial. Here, this factor really isn't applicable because we're at trial, in the middle of trial.

And the fourth factor is the moving party's bad faith or willfulness. The Court is troubled. This is the second incident where something that was considered as a basis for an Expert opinion has not been disclosed in compliance with Rule 26. It distorts the trial process when this does not occur. It jeopardizes the level playing field that the Federal Rules of Civil Procedure anticipate and require the Court to maintain.

*   *   *

Now, it's unfortunate that this has occurred, and I believe a sanction is warranted here. But I decline to impose the requested sanction under Rule 36(c) of dismissal of the claim. Instead, I will strike all testimony regarding any conclusion derived by Mr. Wirkler relative to the Lee, Forsyth, Pulaski, and Mahoning prisons from Exhibit 3. What I will instruct the jury is they are to disregard all of his testimony with regard to the Forsyth, Pulaski, Mahoning, and Lee prisons.

*Id*. at 751:21-753:20.

42.      At critical junctures of the case where Phillips needed to provide substantial and non-conclusory answers, Mollick merely asked him conclusory leading questions and then moved on. For Example, when questioning Phillips about whether the end closures on the infringing panels at the first three jails were equivalent to the patented end closure, Mollick relied only on this line of questions:

Q. What is the function of this piece?

33

A. The end piece?

Q. Yes. A. The function of the end piece is to close the panel off and provide a surface to join the two modular panels together.

Q. Is this a substantial difference from your patent?

A. Absolutely not.

Q. Does this perform the same function as in your patent?

A. Yes, it does.

Q. Does it perform it in the same way?

A. Yes, it does.

Q. And does it achieve the same result as in your patent?

A. Yes, it does."

Exhibit A-4 at 289:12-24.  Ultimately, the trial court after reviewing the transcript in its entirety concluded that "the Plaintiff repeatedly. . . that the Defendants' closures performed the "same function" the "same way" and with the "same result" as his own.  However, this testimony was wholly conclusory, lacking any Explanation of criteria upon which the Plaintiff formed his opinion." LGP Exhibit 49 at 12.

43.     While the parties stipulated in the Final Pretrial Order to a drawing showing how the "end closures" at the first three jails were formed, *see*, LGP Exhibit 35 at Section 4 ¶17, LGP was so unprepared that it was unable to offer any evidence to even Explain the method by which the "end closures" on AWH's second set of infringing jails operated.  LGP Exhibit 49 at 15-16.  During the trial in response to a question from Mollick of how the "end closures" in the second set of jails operated, Phillips attempted to answer the question by drawing on the Exhibit that was currently on the Court's electronic Exhibit system with an Explanation of his annotations.  Exhibit A-4 at 319:4-320:12.  Mollick, however, asked the Court Deputy to erase the marked up Exhibit without printing a copy.  *Id*.  Subsequently, Phillips again tried to Explain the "end closures" in one of the jails from

the second set by drawing on the Exhibit. *Id.* at 320:13-323:23. Although Mollick did ask Phillips another leading conclusory question about whether the "end closures" were equivalent to those of the Patent ("And you have testified that the end closures perform substantially the same function in substantially the same way for substantially the same purpose. Is that correct?) to which Phillips responded "yes," he never moved to admit the marked up Exhibit into evidence or even requested that the marked up Exhibit be preserved in any way. *See*, *id.*

43.1.    Mollick's trial skills and knowledge were so poor that he was unable to lay foundation for the admission of basic evidence, resulting in stinging admonishments by the Court. For example, after failing repeatedly to lay foundation for a photograph that Phillips sought to use as a basis for an opinion, Exhibit A-4 at 302:22-308:24, the Court had to take the step of calling counsel to the bench, in front of the jury, for a lecture:

BY MR. MOLLICK: Q. Is this photograph a true representation of the prison?

A. Yes.

Q. Do you know which prison it is a representation of?

A. I believe it's Winston Salem. I think it's called something else in the list. I can't remember the county name right now.

Q. And you visited this facility?

A. Yes, sir, I did.

Q. And you can -- can you identify from material so that -- Is this a cell for Forsyth County Jail in Winston Salem, North Carolina?

MR. FISCHER: Objection, your Honor. Leading.

THE COURT: Response?

MR. MOLLICK: I'm asking him to identify the photograph.

THE COURT: I sustain the objection. You're not asking him to identify the photograph. You're telling him what it is.

BY MR. MOLLICK: Q. Are there any other jails in Winston Salem?

MR. FISCHER: Objection. Lack of foundation, your Honor. I'm sorry. Lack of foundation.

THE COURT: Overruled.

BY MR. MOLLICK: Q. Are there any other jails in Winston Salem?

A. Not of this type. This -- there may be a city jail or something like that, but I would assume that this is a large county jail. It's eight stories tall. So there is no other building, period, that could be misunderstood -- mistaken for it.

 Q. And which jail is this?

A. It's Forsyth County in Winston Salem.

MR. MOLLICK: I move to admit.

THE WITNESS: Excuse me?

MR. FISCHER: For the record, your Honor, lack of foundation.

THE COURT: Counsel, please approach. (At the bench:)

THE COURT: Mr. Mollick, I'm going to sustain the objection again. The problem here is that this witness has no personal knowledge of this particular picture. He didn't take it, he wasn't there when it was taken, he cannot testify as to whether it truly and accurately represents what it depicts. He is the wrong witness to admit this Exhibit through. **Now, I am concerned because your lack of familiarity with the rules of evidence and your lack of familiarity with the method by which evidence is being presented is impacting your case. It's impacting the jury's ability to understand what this case is about. My job is to ensure that this is a fair trial, and I am concerned that your lack of familiarity with the trial process, if we cannot address it soon, may result in a mistrial. What do you and co-counsel propose to do about this?**

MR. PAYNE: Your Honor, we will more thoroughly familiarize ourselves with the rules of evidence that relate to foundation and otherwise, although I would submit that if he recognizes what is depicted in the photograph that would be an adequate foundation for admission of the Exhibit, if he recognizes it as true and correct.

THE COURT: You haven't laid the foundation that he can recognize it. As he started to say, this was the installation of a cell.

MR. PAYNE: And then he said where it was.

36

THE COURT: And he didn't see it installed. He didn't see that this truly and accurately represents the installation of a cell. He said he got the picture out of a magazine.

MR. PAYNE: But he saw the design as –

THE COURT: That's not sufficient for foundation, Counsel.

MR. PAYNE: Okay.

THE COURT: So, you know, we only have so much time for this trial. Your client's entitled to a fair trial. Your client's entitled to have his case presented so that the jury can understand it. Let's give it another go.

*Id*. at 305:25-308:24 (emphasis added).

44.    In its JMOL Order, the Court concluded that the failure by LGP to offer the marked up Exhibit, or any other evidence on the configuration of the "end closures," in itself, would entitle AWH to judgment on any claim that the second set of jails infringed Claims 22, 24 or 26 of the Patent.  LGP Exhibit 49 at 16.

45.    In granting the JMOL, the Court first concluded that there was not sufficient evidence in the record to support a reasonable jury's finding that any of the seven jails had "end closures" that were equivalent to the Patented "end closures."  LGP Exhibit 49 at. 17.   The Court separately analyzed the evidence concerning the two sets of jails based on the fact that the panels differed between the sets.  *Id*. at 7-17.  With regard to the first three jails, the Court ruled that:

Plaintiff failed, both factually and legally, to sufficiently establish an equivalence between the Defendants' "end closures'" in the first three jails and the end closures described in Claim 22. Factually, the evidence of equivalency was deficient. The Plaintiff testified that the function of the end closure in the Defendants' device was "'to close the panel off and to provide a surface to join the two modular panels together." (Tr. 289). Assuming that this was a sufficient description of the function served by the end closure in the Defendants' design, there was no testimony as to what function or functions the end closures served in the Plaintiff's design, the manner in which the closures in both designs fulfilled that function, and the results obtained by using each design. Without "factual evidence as to the function, manner, and result of the end closure in each design, it would be impossible for a jury to conclude that the designs were equivalent.

*     *     *

> Nor are the Plaintiff's conclusory assertions of equivalence sufficient for application of the doctrine. The Plaintiff repeatedly asserted that Exhibit 22 showed "end closures," or testified that the Defendants' closures performed the "same function" the "same way" and with the "same result" as his own. However, this testimony was wholly conclusory, lacking any Explanation of criteria upon which the Plaintiff formed his opinion. . . .  To be adequate, the Plaintiff's conclusory opinions of equivalence would have had to have been supported by "particularized evidence and linking argument," showing how the Plaintiff compares the function, means, and result of his end closure design with the Defendants' design. . . . No such testimony was presented. Accordingly, the Plaintiff's conclusory assertions of equivalence are insufficient to allow a reasonable jury to conclude that there was infringement.

LGP Exhibit 49 at 11-13.

46.     After determining that the failure to offer or preserve any evidence of the configuration of the "end closures" in the second set of jails was sufficient, on its own, to result in a defense judgment on the claim for infringement of Patent Claims 22, 24 and 26 with respect to the second four jails, the Court also ruled that the failure to offer any non-conclusory evidence of how those "end closures" were equivalent to the Patent also supported the JMOL:

> Putting this defect [LGP's failure to offer or preserve evidence of how the end closures were formed] aside, the Defendants are nevertheless entitled to judgment for reasons similar to those discussed with regard to the first three jails. There is simply insufficient evidence in the record to permit the jury to find that the end closures used on the last four jails were equivalent to the Plaintiff's end closures. Reading the Plaintiff's testimony generously, the only functions he had identified the end closures as performing in the last four jails are closing the module and providing an end surface. As with the first three jails, the skimpy factual record as to how the end closures in the last four jails were designed and how they operated is insufficient to permit a jury to determine that the end closures used by the Defendants are equivalent to the Plaintiff's design. There is no testimony as to the functions performed by the Plaintiff's end closures, the manner in which either design's end closures performed those functions, and the results obtained by each design.  For the same reasons discussed above, the Plaintiff's conclusory assertions that the two forms of end closures were equivalent is insufficient to fulfill the Plaintiffs burden of proof.

LGP Exhibit 49 at 16-17.

47.     If LGP had understood the facts and issues in the case and satisfied its obligation to Phillips to properly offer evidence and present his testimony at trial, Phillips was prepared to testify with admissible evidence sufficient to support a reasonable jury's finding that the "end closures" in

both sets of jails were equivalent in function, manner and result to the Patented "end closures. Exhibit A-17 at ¶¶ 5-5(c)(vi). Specifically, Phillips could have offered testimony based on his review of documents disclosed to him by AWH, or his visits to the infringing jails, or based upon the work he did with AWH employees at AWH's facilities in 1989 and 1990 for the purpose of implementing the Patent into a product that could be manufactured using AWH's manufacturing processes. *Id.*

48.     On these bases, Phillips would, if asked, have testified about the configuration of end closures in the second set of jails (Forsyth, Mahoning, Lee, and Pulaski) built by AWH as follows:

> My knowledge about the end closures in these jails comes from my inspection of the Forsyth jail in 1997, and my visits to the Mahoning, Lee and Pulaski jails in the spring of 1998. My knowledge about the way the end closures worked in the second four jails also was based on my review of a number of documents that AWH gave me in the Patent Lawsuit. While there are many documents that show the configuration of the end closures in the second set of jails, a couple of drawings that are useful to show end closures are the drawing marked AWH10869 which is for the Forsyth jail, and AWH03015 which is for the Pulaski jail. Copies of those drawings are attached to this affidavit as Affidavit Exhibit 1 (AWH10869) and Affidavit Exhibit 2 (AWH03015). If asked at trial, I would have discussed these drawings and shown the end closures on the drawings, and I would have testified about my knowledge gained from looking at the actual end closures at the second four jails, as well as similar end closure designs I helped design for AWH when I was working with AWH.

> On Exhibit 1 I have circled the "end closure" at the area identified as the "adjacent module." As can be seen on this drawing, the end closure on this module consists of two "u" shaped plates. One of the plates is attached to the inside aspect of the inner face of the module, and the other plate is attached to the inner aspect of the outer face of the module. Each plate is the height of the face sheets of the module. Each plate extends inwardly from the face towards the center of the module. The end closure plates do not join or touch directly in the center of the module. Rather, the end closure plates each touch the opposite faces of a piece of insulation. On my visit to Forsyth I saw these end closures. The end closures I viewed at Forsyth appeared as they are illustrated on Exhibit 1. Additionally, during the time that I was working with the AWH in 1989 and 1990, I worked with them on this end closure design that they were designing, with my assistance and approval, to preserve the function and manner of my invention while accommodating their fabrication needs. To the best of my memory, the end closure plates of this variety that I observed at Forsyth and while working with AWH were attached to the inner aspect of the module's face plates by welding.

On Exhibit 2 I have circled the "end closure" in "Detail 1" called panel joint connection. This illustration shows only one face of the module. This drawing shows two side to side modules abutting at their end closures. As seen, there is a plate welded to the inner aspect of each module face. While the drawing shows only one face, the opposite face has the same plate configuration welded to its inner aspect. As in Exhibit 1, the closure plates extending inwardly from the module faces to the center of the module do not make direct contact in the center, but instead both make contact with a piece of insulation. Exhibit 2 also reveals that the end closure plates of adjoining modules are not attached to directly touch when the modules are joined. Instead, per the drawing, the modules attach through insulated fasteners that provide separation between adjacent module end panels. On my visit to the Pulaski jail I saw these end closures both from a front view looking at the closed side of a module, as well as from a top view looking down into a module that was not yet covered on top. The end closures I viewed at Pulaski appeared as they are illustrated on Exhibit 2. Additionally, during the time that I was working with the AWH in 1989 and 1990, we worked on this end closure design that AWH was implementing, with my assistance and approval, to preserve the function of my invention while accommodating their fabrication needs.

*Id*. at ¶ 5(a).

49.    On these bases, Phillips would, if asked, have provided additional testimony about the configuration of end closures in the first set of jails as follows:

 While there are many documents that show the configuration of the end closures in the first thee jails in addition to the ones admitted at trial, another useful drawing showing the manner in which these end closures functioned is at AWH02262. A copy of that drawing is attached as Affidavit Exhibit 3. I would have discussed this drawing and shown the end closures on the drawing, and I would have testified about my knowledge gained from looking at the actual end closures at the first set of jails, as well as similar end closure designs when I was working with AWH.

Any of the details on Exhibit 3 shows the end closures. A good example is the detail of Part C-2, and I have circled one of the end closures on that detail. This drawing shows that the end closures are formed by bending the inner (bottom on the drawing) face sheet of the module toward the center of the module, then at an out and up angle, and then back to the center line of the module. The outer face sheet (on the top) is bent up and back in a hook shape. The end closure is completed by welding a plate to the inner facet of the outer face sheet. That plate is then bent to the center of the module, then out to the distance of the bent inner face sheet, and then down along the inside edge of the bent portion of the inner face sheet. The inner aspect of the bent inner face sheet does not directly touch the outer aspect of the bent end closure plate, but instead is separated by an insulating strip and then fasted with an insulated fastener. On my visits to the first three jails I saw these end closures both from a front

view looking at the closed side of a module, as well as from a top view looking down into a module that was not yet covered on top.  The end closures I viewed at the first three jails appeared as they are illustrated on Exhibit 3, and as illustrated on other exhibits admitted at trial.  The end closures on the first three jails are the same as those I worked on with AWH in 1989 and 1990, in order to preserve the function of my invention while accommodating their fabrication needs..

*Id*. at ¶5(b).

50.    Phillips also would have provided the following testimony to establish with particularized evidence and linking argument how the "end closures" at both sets of AWH's jail was equivalent to the Patented "end closure"

If I had been asked at trial I also would have provided much more testimony on the function of my patented design for the end closure, the manner that my patented designs served that function, the manner in which the infringing end closures at both the first three and second four jails served the same function, and the results obtained by all the designs.

I would have testified, if properly prepared and asked to do so, that the patented end closures served multiple functions including: The end closure sealed the sides of each module for purposes including to prevent contraband from being placed in the modules. The end closures also provided a surface to connect adjoining modules to make longer wall systems.  Perhaps most importantly, my invention's end closures permitted the other functions to be met while at the same time meeting the critical need of reducing the passage of thermal or acoustical energy from the inner face of the module to the outer face of the module.

By forming my end closures from the inner face and outer face, but not having the bent faces touch directly but instead only "meet" at an insulated separator, the manner in which my end closures were configured served the function of closing the module, providing a surface for attaching adjoining modules, and limiting the passage of thermal and acoustical energy from one face of the module to the other.

As illustrated on Exhibit 3, and elsewhere at trial, the manner in which the end closures on the modules used in the first three jails were configured performed the same function as my invention, in an essentially identical manner.  The end closures on those modules sealed the sides of the module to maintain the integrity of each module.  The end closures on those modules also provided an interlocking system to adjoin modules to each other and make walls.  Because the end was closed at an insulated attachment, the end closures used in the first three jails also met the critical function of resisting the passage of thermal and acoustical energy from one face of the module to the other.  Although the end closures in the first three jails included an

41

extra plate that was both welded to one of the faces, and "attached" at an insulted separation to the other face, that change was not substantial in the function of the end closure, or the manner in which the end closure achieved the function. The third welded piece essentially became a continuos piece with the face to which it was welded, and then bent to form an end closure with the opposite bent face.

As illustrated on Exhibits 1 and 2 the manner in which the end closures on the modules used in the second four jails were configured performed the same function as my invention, in an essentially identical manner. The end closures on those modules sealed the sides of the module to maintain the integrity of each module. The end closures on those modules also provided a way to adjoin modules to each other with insulated fasteners and make walls. Because the end was closed by bringing both end closure plates to an insulated separator for "attachment," the end closures used in the second four jails also met the critical function of resisting the passage of thermal and acoustical energy from one face of the module to the other. Although the end closures in the second four jails included two extra plates, each welded to the inner aspect of the opposing face sheets, and "attached" at an insulted separation to each other, that change was not substantial in the function of the end closure, or the manner in which it achieved the function. The additional welded plates essentially became  continuos pieces with the face to which they were welded, and then bent inwardly to form an end closure with the opposite bent face at an insulated separator.

Each of the end closures provided satisfactory results in meeting the function. The end closure I invented resulted in panels obtaining fire ratings, and their function was adequate so that I was able to use them in panels I manufactured and used in a number of projects for my own modular detention facility business in from the end of 1990 through 1993. I was involved in the design of the end closure used in the first set of jails, and, in fact, approved that design when I was working with AWH as an acceptable equivalent to my end closure. I am aware that the end closures obtained a satisfactory functional result as they were used in panels approved at and installed in the first three jails. Similarly, my inspection of the end closures used in the second set of jails, and, the drawings for these end closures, reveals that this is an acceptable equivalent for  fabricating my patent as these end closures seal the module, provide an insulated attachment to other modules, and do so while resisting the transmission of thermal and acoustic energy from the inner face to the outer face. As in the first three jails, I am aware that the end closures obtained a satisfactory functional result as they were used in panels approved at and installed in the second set of four jails.

Although the fabrication of the end closures varied from my design, to the design shown in Exhibit 1, to that shown by Exhibits 2 and 3, as I have described above there is no substantial difference in the function, manner or result obtained by the various configurations.

*Id*. at ¶5(c).

42

51.     During trial another critical issue in dispute was whether the insulation referenced in Patent Claim 21, by itself, was capable of resisting the impact of bullets, exploding projectile and bomb fragments.  LGP Exhibit 49 at 18.  Only after the evidence in the case was all submitted, and the parties were arguing to the Court concerning jury instructions, did LGP attempt to argue that the claim construction of Claim 21's limitation of "insulating material providing substantial thermal, sound, and impact resistance" should be changed.  Exhibit A-4 at 1148:10-1157:10.  In rejecting LGP's argument, the Court noted that LGP was attempting to argue a claim construction, and "it was not something that this court has received evidence on. And now we 7 are at the time of instructing the jury without the appropriate factual foundation to make an appropriate *Markman* construction." *Id*. at 1154:25-1155:8.

52.     Similarly, when LGP tried to argue the claim construction of "end closure" at the jury instruction conference to permit welding and bending it was met with a response that the time for such argument was past.  *Id.* at 1158:3-20.

53.     LGP made no effort to readdress claim construction issues, such as the construction of the limitation "end closure" in Claim 20, or the limitation "insulating material providing substantial thermal, sound, and impact resistance" in Claim 21 until the jury instruction conference where the arguments were too late and rejected.  *Id.* at 1154:25-1155:8 and 1158:3-20.

54.     In granting the JMOL Order, the Court concluded that the failure by LGP to offer sufficient evidence for a reasonable jury to support a finding that the insulating material provided "impact resistance" to bullets, exploding projectile and bomb fragments entitled AWH to a judgment on infringement of Claim 21.  LGP Exhibit 49 at 21.  The Court found that :

> Considering the evidence in the light most favorable to the Plaintiff, there is some evidence - namely, the Plaintiff's single statement on cross-Examination - that mineral fiber insulation would resist the impact of a .22 caliber bullet. However, the Court's construction of the term "impact resistance" is broader than that. The Court construed the term in the conjunctive to mean the ability to withstand the impact of "bullets, exploding projectiles, and bomb fragments." (Emphasis added.) Nothing in the record

43

addresses the ability of mineral fiber insulation to resist exploding projectiles or bomb fragments, nor of bullets other than .22 caliber. Although there is evidence that the insulation would resist one kind of impact, the Court's construction of the term "impact resistance" required the Plaintiff to show that the insulation could withstand a variety of types of impact. Because the Plaintiff's evidence failed to establish that the Defendants' insulation met all of the limitations in Claim 21, no reasonable jury could find infringement with regard to Claim 21. Accordingly, the Defendants are entitled to a judgment of non-infringement on this claim.

*Id*. at 20-21.

55.     If LGP had understood the facts and issues in the case and satisfied its obligation to Phillips to properly offer evidence and present his testimony at trial, Phillips was prepared to testify with admissible evidence sufficient to support a reasonable jury's finding that the "insulating material" used by AWH at the seven jails provided "impact resistance" as follows:

If I had been better prepared by LGP, or asked at trial by LGP, I would have provided additional testimony about the impact resisting properties of the insulation that was used both in my modules and the modules manufactured and installed by AWH at the infringing jails. My knowledge of the type of insulation used by AWH comes from the testimony of their representatives at depositions, from my own work with the Patent Defendants during 1989 and 1990, and from my inspection of the jails built by the Patent Defendants. My knowledge of the properties of the type of insulation used comes from my own work over many years designing and manufacturing modular steel shells. I have been involved in doing research on insulation, using insulation and testing insulation for these products for more than 25 years. At the time of the 2006 trial I was continuing to study and test insulation for my own modular systems that I was designing at that time.

I am aware that the Patent Defendants used Thermafiber K-Fac 19 insulating board compressed to 9 pounds in their infringing panels. I have done considerable work and testing with that exact product over many years. I am aware from many sources, including the specification sheets for the insulation, that this insulting board is rated to crush 10% at 5000 pounds per square foot of impact pressure. This gives this product a higher impact resistance with less failure and local bending than 14 gauge steel used in the panel face. While this insulation, at this weight, would not be sufficient in itself to fully stop all bullets, bomb fragments or exploding projectiles, it would provide resistance to those projectiles by slowing them. In light of the knowledge I have gained working with these materials in the design of fire rated security panels, I would have testified that it is the insulation itself that slows and resists projectiles, rather than the steel shell in which the insulation is enclosed. The steel shell prevents the insulation from fracturing. While the steel shell with the

44

insulation is the best way to provide impact resistance, the insulation on its own provides resistance by slowing the velocity of projectiles.  This is true regardless of whether the impact to be resisted is from a fragment of a bomb or exploding projectile or a bullet, as all three are high velocity projectiles.  All three will encounter significant resistance from insulation that crushes only 10% at the application of 5000 pounds of force per square foot.  Thus, if I had been asked to testify in more detail based on my own knowledge acquired in the design and manufacture of my products, I would have testified the insulation boards used in AWH's infringing panels, independent from the steel shells, would have provided substantial heat and acoustic resistance, as well as substantial resistance to the impact associated with bullets, and exploding projectile and bomb fragments.

Exhibit A-17 at ¶7.

56.     Following the close of the evidence, LGP unsuccessfully offered a jury instruction to include the "entire market theory" in the damages instructions.  *See*, Exhibit A-4 at 1189:18-1201:22. The following morning, the Court rejected that instruction on the grounds that Plaintiff had failed to offer any evidence in the case that he would be entitled to such an instruction:

[T]he opinions that have been cited by the parties . . . involve factual situations where the patentee and the alleged infringer were competitors in the same market. And the application of what has been – what has become known as the entire market value concept concerns the addition of components not subject to the patent which either party could have added to the patented product.

That is not our factual scenario here. Mr. Phillips was not a competitor of the defendants, Mr. Phillips was not manufacturing this product, and there is no evidence that Mr. Phillips could have added the toilets and other auxiliary units to the patent, as did the defendants.

*          *          *

The Court therefore concludes that since the facts in this case do not support the application of the entire market value concept because the parties were not competitors, each able to add products or goods to the invention, the entire instruction is inappropriate and is excluded.

*Id.* at 1223:4-1224:2.

57.     LGP failed to elicit any testimony from Mr. Phillips on whether he was a competitor of AWH during the period of the infringement, whether he did manufacture the patented product at that time, and whether he could have added toilets, fixtures and furniture to the product he

45

manufactured in the way that AWH did.  If, however, LGP had been prepared to offer this testimony,

Mr. Phillips would have provided sufficient evidence to support the tendered instruction:

> If I had been better prepared by LGP, or asked at trial by LGP, I would have provided testimony about my own work as a competitor in the fabricated modular steel prisoner detention facility industry during the years that AWH was manufacturing and selling products that infringed on the patent.  Although I suffered debilitating injuries in January and February of 1993 that ended my ability to compete in this industry, from the end of 1990 until I was injured I was a competitor in the industry as follows:

> From the end of 1991 until January 1993 I had at least three projects where I manufactured, sold, and installed the patented fabricated modular steel panels for the purpose of creating new, or updating existing, prisoner detention facilities.  The projects included:

> Holding cells at the Torrington Wyoming court house and county jail.  From 1991-1993 I added to the existing facility an approximately 6 cell holding facility for the Torrington Wyoming court.  For this project I replaced the existing detention structures with patented modular panels that I fabricated in Fort Collins, Colorado, and then installed on site.  As part of my contract I also provided all the non-patented furniture and fixtures for those cells including sinks, toilets, plumbing, lighting, and attached furniture.  I completed the project by 1993.  The project paid a sufficient amount to cover most of the costs, however, no profit was made.

> Holding cells at the Adams County Colorado court house.  In 1991 I was the prime contractor for the construction of a new holding cell facility for the Adams County court.  For this project I manufactured and installed detention structures with patented modular two foot panels that I fabricated in Estes Park, Colorado, and then installed on site.  As part of my contract I also provided all the non-patented furniture and fixtures for those cells including sinks, toilets, plumbing, lighting, and attached furniture.  I completed the project by 1991.  The project paid a sufficient amount to cover most of the costs, however, no profit was made.

> Union County Jail in Elizabeth, New Jersey.  Beginning in 1991 I was given the single source sub-contract to retrofit a hundred year old 1800 prisoner jail by installing patented steel modules.  The contract included providing all the non-patented furniture and fixtures for those cells including sinks, toilets, plumbing, lighting, and attached furniture.  I manufactured a number of panels in Estes Park and then shipped them to Elizabeth New Jersey.  I also worked with a metal fabrication sub-contractor in New Jersey to manufacture some patented panels for me while I installed the panels, fixtures and furnishings. At the time of my injury I had completed about 10% of the job.  I believe that the metal fabricator sub-contractor I used then took over the job.  The project paid a sufficient amount to cover most of the costs through my injury, but was not completed.

I do not believe that I have records from these projects as they were destroyed when my house exploded in 1993.

It was customary in the prefabricated modular building industry, with which I was involved for many years before 1990 and again in 1991-1993, for the contractor to provide and install fixtures and furnishings that are attached to and a part of the modular structure.  This was the case in the three projects that I worked on 1991-1993.

Exhibit A-17 at ¶8.

### – Procedural Facts Relating to the Present Case Between LGP and Phillips

58.     LGP filed its initial claim for attorneys' fees, in the form of a Motion to Enforce Lien, against Phillips in the closed Patent Lawsuit on April 20, 2007. [PL Doc. #420[2]].

59.     Phillips filed a Motion to Dismiss LGP's claim for fees for lack of jurisdiction on September 4, 2007 [PL Doc. #411].

60.     Knowing that Phillips was about to file a Motion to Dismiss its claims in the Patent Lawsuit, LGP filed the present case on or about August 16, 2007. [Doc. #1].

61.     On September 6, 2007, the Magistrate Judge held a conference at which he stayed proceedings in the Patent Lawsuit pending the resolution of the Motion to Dismiss for Lack of Jurisdiction. *See*, September 7, 2007, Minute Order [PL Doc. #417].  On October 16, 2007, Phillips filed a Motion to Stay this case pending a resolution of the Motion to Dismiss filed in the Patent Lawsuit. [Doc. #31].

62.     On April 14, 2008, Phillips filed his Counterclaims against LGP's fee claims in the Patent Lawsuit, designating those counterclaims as "provisional" in light of the pending Motion To Dismiss and resulting stay. [PL Doc. #490].

---

[2]     The reference to "PL Doc. #__" is to the Docket in the Patent Lawsuit.  In the event that the Court or any parties here are unable to obtain referenced filings from that case, Phillips' counsel will provide them – if available – upon request.

63.     On September 4, 2008, Judge Krieger granted the Motion to Dismiss, and did dismiss without prejudice all of the claims and counterclaims in the Patent Lawsuit for lack of subject matter jurisdiction. [PL Doc. #516].  The same day Judge Krieger issued an order in this Case directing Phillips to file his response to LGP's complaint within 10 days. [Doc. #62].  Phillips did so, and filed his Answer, Rule 12(b) Defenses, and Counterclaims against LGP on September 18, 2008. [Doc. #68].

64.     On September 17, 2008, Manthei filed his Complaint against Phillips, DM and local counsel Hensly Kim & Edgington in the District Court for the County of Boulder, State of Colorado, Case Number 2008-cv-1007 (the "State Court Case").  Exhibit A-27.

65.     In his Complaint Manthei demands payment by Phillips of an attorney fee in the minimum amount of $1,147,500.00 (45% of $2.55 million) plus statutory interest from December 29, 2006, and costs in the amount of $74,000.00 plus statutory interest from the time each expense was incurred.  Exhibit A-27 at ¶¶ 66-67.  Therefore, Manthei's claims for costs and fees, without any additional interest or other charges, totals $1,221,500, or 47.9% of the $2.55 million fund.

66.     On June 19, 2009, LGP submitted an opinion in this case that LGP claims that it is entitled to be paid from the $2.55 million fund at least $1,072,227 in hourly fees.  Exhibit A-28 at page 16.  LGP also claims in its initial disclosures that it should be paid at least $1,080,227, in hourly fees and costs plus interest and fees and costs from this attorney fee/malpractice case, from the $2.55 million fund.  The fees and costs sought by LGP (without inclusion of interest or the costs of this case) represents over 42% of the $2.55 million paid by the Patent Defendants to Mr. Phillips.  Collectively, in the two actions LGP and Manthei seek to be paid at least 90% of the funds paid by AWH to Phillips.

67.     LGP's fee claim against Phillips is dependent, in determining the maximum amount LGP can recover, on the initial determination of the fees Manthei can recover.  The fee agreement provides, in part, that:

The fee payable to the [LGP] upon said recovery, exclusive of fees and costs paid to any other attorneys which represent or have represented the Client shall be the <u>reasonable value of [LGP's] services</u>, as measured by the ordinary hourly rate value of time expended and costs incurred from October 1, 2005 onward, <u>plus any balance remaining from forty-five percent (45%) of recovery in the litigation, if any,</u> **after payment of the above and obligations to previous counsel [Manthei] is determined.** . . . Furthermore, said fee and costs, when combined with all other fees and costs owed to other attorneys, is not limited to forty-five (45%) percent of the recovery if the reasonable value of [LGP's] services has not been fully compensated. . . . **However, in no instance shall [LGP's] fees, when combined with fees and costs of other law firms, exceed the total recovery received by Client. Additionally, notwithstanding the foregoing, the Client shall receive a minimum of one-fourth (1/4) of the proceeds of recovery, after payment of all costs, not including fees charged by local counsel, even if the reasonable time value of [LGP's] services has not been fully compensated**.

LGP Exhibit 25 at ¶2 (emphasis added).  Manthei's claim to recover more than 47% of the amount paid by AWH, combined with LGP's claim to recover more than 42% of the amount paid by AWH, subjects Phillips to inconsistent judgments and a Court approved breach by LGP of its fee agreement.

68.     LGP has designated Manthei as a responsible non-party at fault pursuant to Colorado's proportionate fault statute. [Doc. #97].  LGP's alleges that:

Carl Manthei, Mr. Phillips' attorney at times relevant to the counterclaims in this case bears some or all of the fault and responsibility for the damages claimed by Mr. Phillips in this action. Mr. Manthei is liable to Mr. Phillips for such claimed damages, to the extent that Mr. Phillips has any damages at all.  Carl Manthei, Esq. began serving as attorney for Mr. Phillips years before LGP became involved in the underlying action. This representation was started, and occurred primarily in, Colorado. As a part of that attorney-client relationship, Mr. Manthei owed Mr. Phillips those duties and loyalties that are present in an attorney-client relationship in Colorado.  In his capacity as counsel for Mr. Phillips, Mr. Manthei made those decisions, took those actions and failed to take those actions that Mr. Phillips would attribute to LGP in his counterclaim.  For example, Mr. Manthei decided whether or not to dispute certain arguments and assertions of the underlying defendants, which decisions bound or severely limited Mr. Phillips and LGP as successor counsel; made disclosures and endorsements of both lay and expert witnesses, which disclosures and endorsements were binding or severely limiting for Mr. Phillips and his successor counsel, LGP; failed to formally disclose other facts in writing, or in an otherwise demonstrable manner, such as the fact that Ed Phillips' opinions, and the opinions of other witnesses, were based in part on a site visit of which the underlying defendants claimed that they were not made aware, and were based in part upon documentation reviewed by Mr. Phillips during that visit. Mr. Manthei was also responsible for the disclosure of the opinions of retained expert witnesses, and the bases for those

opinions.

Mr. Phillips claims that these disclosures, decisions and concessions, as well as other matters handled by Mr. Manthei, were deficient or otherwise problematic, such that Mr. Phillips' case against the patent infringement defendants was compromised. To the extent that any of the difficulties complained of by Mr. Phillips were correctable in the course of the underlying action, or could be rectified through the discovery process, it was Mr. Manthei who allowed the deadlines to make such changes, corrections, discovery or endorsements, to pass without addressing the issues about which Mr. Phillips now complains. Additionally, it was Mr. Manthei who secured the expert testimony and evidence that had to be disclosed, in its entirety, before LGP became involved in Mr. Phillips' case. To the extent that Mr. Phillips suffered damages, responsibility for such damages lies with Mr. Manthei.

Doc. #97 at ¶2-4.

69.    In response to the legal malpractice counterclaims Phillips filed against Manthei in the State Court Action, on January 24, 2009, Manthei designated LGP and its individual attorneys as non-parties at fault for the malpractice claims filed against him pursuant to Colorado's proportionate fault statute. Exhibit A-29.  Manthei's description of LGP's liability for Mr. Phillips damages is a nearly the mirror image of LGP's designation of Manthei:

LaRiviere, Grubman & Payne and its attorneys, specifically, but not limited to, Robert Payne and attorney Mollick: These attorneys were Phillips' second set of attorneys and had an attorney-client duty to exercise due care and to provide competent representation. They breached these duties by their negligent trial preparation, trial performance and post-trial representation. More specifically, they failed to pursue the motion filed by Manthei in the fall of 2005 to clarify claim terms that would have prevented the JMOL ruling of Judge Krieger; and according to Phillips, committed other acts and omissions that demonstrated a lack of skill and effort as more fully set forth in Phillips' counterclaims in federal court in case 07-cv -723.  If Phillips suffered any damages or losses, LGP and its attorneys caused it.

*Id*. at ¶1.

70.    On August 17, 2009, Phillips submitted his Re-filed Motion to Dismiss Without Prejudice Pursuant to Federal Rules of Civil Procedure 12(b)(7) and 19 for Failure to Join Required Party Carl Manthei. [Doc. #281] That motion is predicated on the fact that Manthei is required both on the attorney fee claim asserted by LGP, as well as on the compulsory counterclaims, that the Court

cannot join Manthei without destroying diversity jurisdiction, and that as a matter of "equity and good conscience, the action should be dismissed" because Manthei cannot be joined under the facts before the Court.  The Motion to Dismiss is fully briefed.

71.    On July 2, 2009, LGP filed a Motion to Reopen Phillips' 1991 Bankruptcy case predicated on the argument that Phillips failed to disclose in that case that he owned patents including the '798 Patent.  Exhibit A-30.  On the same day, LGP filed a Suggestion of Bankruptcy in this case with regard to its Motion to Reopen Phillips' 1991 Bankruptcy case. [Doc. #238].

72.    On July 27, 2009, the Magistrate Judge in this case ordered that affirmative expert witness disclosures were due to be filed by August 20, 2009. [Doc. #260]

73.    On July 30, 2009, the Court entered an Order to Show Cause [Doc. #265], providing that, unless cause was shown to the contrary, it would stay this action in light of the suggestion that there were ongoing Bankruptcy Court proceedings involving Phillips.  In his response to the Show Cause Order, Phillips requested that the Court stay this case until such time as the Bankruptcy Court resolved the Bankruptcy matter that had come before it on LGP's Motion to Reopen. [Doc. #277].  LGP opposed a stay . [Doc. #276].  On August 14, 2009, this Court issued a Minute Order that it would "defer a ruling on whether a stay of this case is appropriate as to Edward H. Phillips until the Bankruptcy Court has ruled on the motion to reopen the bankruptcy." [Doc. #280].

74.    On August 18, 2009, a conference was conducted in the Bankruptcy case.  In an advisement to this Court filed later that day, Phillips notified this Court that Bankruptcy Court Judge Brooks "urged" the parties to tell this Court that he recommended that this Court "delay . . . the current discovery and related pre-trial procedures and deadlines [in this case] until after [the Bankruptcy Court gets] the standing issue resolved." [Doc. #282 at 3-4].

75.    On August 19, 2009, Phillips filed a motion to immediately stay all pre-trial disclosure and discovery deadlines and procedures, including the pending expert witness disclosure deadline, based on Judge Brooks' request. [Doc. #285] This Court granted that Motion, ruling that:

it is ORDERED that Defendant/Counter Claimant Edward H. Phillips' Motion for Stay of Pre-Trial Disclosure and Discovery Deadlines and Procedures in Light of the Recommendation of United States Bankruptcy Court Judge Brooks (Doc. # 285) and his Request for Forthwith Entry of Stay (Doc. # 282) are GRANTED. All pretrial disclosure and discovery deadlines are STAYED pending a ruling by Judge Brooks in the Bankruptcy Court. After such a ruling is made, I will then reassess the issue of a stay.

[Doc. #294 at 4.]

76.     On August 19, 2009, Phillips also filed a separate Motion for Stay Pending Resolution of the Re-filed Motion to Dismiss Without Prejudice Pursuant to Federal Rules of Civil Procedure 12(b)(7) and 19[doc. #281], and Request for Forthwith Oral Argument to the Court and Forthwith Ruling. [Doc. #286]. In essence, that Motion requested a stay based on the prejudice Phillips would suffer from having to endorse experts to rebut LGP's defense that Manthei is fully responsible for the damages suffered by Phillips, as such experts could then be used by Manthei to defeat Phillips' claims in the State Court.

77.     The Court ordered that the parties complete the briefing in the Motion for Stay at Doc. 286. [Doc. #294 at 4]. That motion has been fully briefed and is awaiting a ruling by the Court.

78.     The Bankruptcy Court conducted a hearing on LGP's Motion to Reopen on November 3, 2009, and resumed that hearing on January 5, 2010. The Bankruptcy Court concluded the hearing on standing on January 19, 2010.

## IV.  ARGUMENT

**1.     IN THE INTEREST OF JUDICIAL ECONOMY AND FAIRNESS TO THE PARTIES, THIS COURT SHOULD DISMISS THIS CASE WITHOUT PREJUDICE, BASED ON LGP'S FAILURE TO JOIN REQUIRED PARTY MANTHEI, RATHER THAN RULE ON THIS MOTION.**

It is notable that half the arguments raised by LGP in this Motion for Summary Judgment ("Motion") are based on the predicate argument that LGP claims it can have no liability to its former client because all of the adverse circumstances faced by Phillips were the result of predecessor counsel Manthei's errors. The most significant arguments raised in the Motion by LGP argue that

no matter what LGP should or would have done in the case, none of its actions could have caused Phillips any injury because Manthei's errors made the ultimate loss of the case inevitable and unavoidable.

As noted in Phillips Statement of Facts at ¶68 and 69, Manthei and LGP have each taken the same position in their respective attorney fee cases against Phillips by accusing the other of negligence and starting that, as a result, nothing they did could have caused Phillips's harm.  Before this Motion seeking judgment against Phillips with prejudice primarily due to the absent Manthei's conduct  was filed by LGP, Phillips filed his Motion to Dismiss without prejudice for failure to join Manthei in this case.  LGP's Motion for Summary Judgment, seeking to blame Manthei as a tool to avoid liability for its own conduct, further proves the merit of Phillips' Motion to Dismiss. As a threshold matter, and in the interests of fairness and judicial economy, Phillips requests that the Court dispose of this case, without prejudice, on the grounds set forth in is Motion to Dismiss.

## 2.     SUMMARY JUDGEMENT STANDARD OF REVIEW

Fed.R.Civ.P. 56(c) allows the Court to grant  summary judgment only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248-50 (1986). The movant party bears the burden of showing an absence of evidence to support the nonmoving party's case, *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986), and only after the "moving party meets this burden [does] the burden shift to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works, Inc. v. City & County of Denver*, 36 F.3d 1513, 1517 (10th Cir.1994)

"Summary judgment is a drastic remedy and any relief pursuant to Fed.R.Civ.P. 56 should be awarded with care." *Conaway v. Smith,* 853 F.2d 789, 792 n. 4 (10th Cir.1998). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."

*Anderson*, 477 U.S. at 255.  Because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge,"the Court's role in addressing a summary judgment motion is "simply to determine whether the evidence proffered by [the] plaintiff would be sufficient, if believed by the ultimate factfinder, to sustain her claim," *Jones v. Barnhart*, 349 F.3d 1260, 1265-66 (10th  Cir. 2003)

### 3.       THE ISSUE OF CAUSATION IN LEGAL MALPRACTICE

A number of arguments presented by LGP's Motion require an analysis of the standards of Colorado law on legal malpractice and causation. Specifically in LGP's arguments at IV, VIII, IX, X and XI, it argues that causation questions are matters of law for the Court.  In those arguments, LGP seeks to create the impression that it is the role of the Court in a legal malpractice case to revisit, as a matter of law, orders granted or denied in the underlying case in almost a reviewing role to determine in an absolute sense if the underlying case judge would have entered a different order but for the alleged errors of counsel.  In a similar vein, in its argument at section X, LGP requests that this Court actually conclusively re-decide substantive motions that were filed, but not resolved, in the underlying case.  LGP's arguments misstate the Court's role in a addressing causation in a legal malpractice case.

To prevail on a claim of legal malpractice under Colorado law, a claimant needs to prove that "(1) the attorney owed a duty of care to the [claimant], (2) the attorney breached that duty, and (3) the attorney proximately caused damage to the [claimant]."  *Bebo Construction Co. v. Mattox & O'Brien, et at.*, 990 P2d 78, 83 (Colo. 1999).  Proof of proximate cause has two elements: "that but for the attorney's actions, the injury would not have occurred" and through proof of a "case within a case" that the underlying case would have been more successful without the breach. *Brown v. Silvern*, 45 P.3d 749, 751 (Colo. App. 2001).   There may be more than one proximate cause of a plaintiff's legal malpractice injury.  *Id.*

As a general rule, "[c]ausation is usually a question of fact to be decided by the jury [and only where] the facts are undisputed and reasonable minds could draw but one inference from them [does] causation becomes a question of law for the court." *Allen v. Martin*, 203 P.3d 546, 566 (Colo. App. 2008). Nevertheless, in legal malpractice actions numerous authorities support the proposition that where the alleged negligence resulted in the underlying court making a decision (such as ruling on motions, objections or appeals) that allegedly should have been different but for the negligence, the issue of causation is one "of law" for the Court in the malpractice case. *See* Ronald E. Mallen & Jeffrey M. Smith, 1 *Legal Malpractice* §35.15, at 1253608 (2009 ed.) (hereinafter "Mallen"). There are, however, reported decisions holding that even where the alleged consequence of the negligence was a decision by an underlying court, the issue of causation is still a question of fact for the jury. *See, for example*, *Andrews v. Saylor*, 80 P.3d 482, 487 (N.M. App. 2003) (the Court held that even where the alleged malpractice relates to the failure to bring an appeal, the jury rather than judge should decide whether the appeal should have been successful absent the malpractice).

Regardless of whether causation is determined by the Court as a "question of law" or the jury as a "question of fact," however, "[t]o prove causation in a negligence case, the plaintiff must show by a preponderance of the evidence that the injury would not have occurred but for the defendant's negligent conduct." *Kaiser Foundation Health Plan of Colorado v. Sharp*, 741 P.2d 714, 719 (Colo. 1987). The law defines a critical distinction: A judge resolving a disputed legal issue, such as a pre-trial motion, in the underlying case must make a certain, and perhaps dispositive determination of the rights of the underlying parties under the applicable standards to that decision. On the other hand, when the Court in the malpractice case looks at the underlying decision, and considers whether that decision should have been different but for the alleged negligence of the defendant attorney, the malpractice case judge is not deciding the underlying issue between the underlying parties. Instead, as dictated by *Kaiser*, the Judge in the malpractice case is only deciding, based on the evidence before it, whether it is more likely than not that the legal decision should have been different but for the

alleged negligent conduct of the attorney. Thus, the malpractice case judge does not need to reach a certain decision on the underlying legal question, but instead reaches a finding only that the underlying legal decision probably would have been different if the lawyer was not negligent. Moreover, like any other causation determination, the Court need not find that the defendant attorney's alleged misconduct had to be the only cause of the underlying judge's decision, but instead can find that it was "a" cause of the decision. *Brown v. Silvern*, 45 at 751. Additionally, if the Court finds that there is dispute in the facts necessary to resolve the causation question and more evidence is needed, then the Court can decline to grant summary judgment.

In light of these legal principles, Phillips requests that the Court determine that the causation questions presented by LGP's arguments at Section IV, VIII, IX, X and XI of its Motion be determined by the jury as questions of fact, and, based on disputes of material facts evidenced above, that summary judgment be denied. Alternatively, if the Court concludes that some or all of the causation questions presented by LGP's arguments are proper for its decision, Phillips requests that the Court decide those issues not as the judge sitting in the underlying case, but as a fact finder determining whether it is more likely than not that the result should have been different but for LGP's alleged errors.

### 4.   THE OWNERSHIP DEFENSE IS NOT RELEVANT TO LGP'S ALLEGED NEGLIGENCE AND, THEREFORE, IS NOT DISPOSITIVE ON LEGAL MALPRACTICE CAUSATION

For its lead argument in support of summary judgment, LGP seeks to avoid any exposure for its own negligence by trying to rely upon an "ownership" defense to the underlying patent infringement claims that the underlying defendant, AWH, never pursued, and that has no connection whatsoever to the allegations of malpractice against LGP. In addition, LGP ignores that the "ownership" defect, if it had been of any consequence to AWH, could have been cured in the underlying case. Moreover, there is factual dispute about whether LGP knew of the "ownership" issue at the time it represented Phillips in the Patent Lawsuit, yet kept that knowledge "under its hat"

in order to reduce risk in the underlying case and give itself leverage for future disputes.  Because the law does not support LGP's position that it can raise in this case defenses that were not pursued in the underlying case and that are not relevant to the claims of negligence against it, and because there are factual disputes about LGP's knowledge of the "ownership" defect, summary judgment is inappropriate.

      **A.**      **The long-dormant question of patent ownership is causally irrelevant to Phillips' malpractice counterclaims against Manthei, because the underlying patent case was actually litigated through judgment without any of the underlying defendants advancing a defense about ownership**.

LGP's argument implicitly and incorrectly assumes that a party defending a legal malpractice claim is absolutely entitled, without limitation, to re-litigate the entire underlying case anew — to take a mulligan, as it were.  Understanding why that assumption is erroneous, at least where the underlying case has been tried on the merits through a final resolution, requires some unpacking of basic principles concerning the tort of legal malpractice.

In a malpractice case, the plaintiff "must establish that (1) the attorney owed a duty of care to the plaintiff, (2) the attorney breached that duty, and (3) the attorney proximately caused damage to the plaintiff."  *Bebo Construction Co. v. Mattox & O'Brien, P.C., supra*, 990 P.2d 78,  83 (Colo. 1999), *citing* Mallen § 8.12, at 608.  Although "[e]stablishing causation in a legal malpractice action requires the plaintiff to prove what has been characterized as a 'case within a case,'" *Bebo*, 990 P.2d at 83, there is nothing in this characterization which suggests that the entire underlying case may be re-litigated in its entirety.  Rather, it is more accurate to say that the underlying case may be re-litigated, **but** only to the extent necessary for determining whether there is a sufficient causal connection between the alleged act(s) of malpractice and the malpractice claimant's injury. As the leading legal malpractice treatise puts it:

> If the underlying action was fully tried, then it may not be necessary to retry the entire case.  If the alleged error presents only a narrow issue, then the "different result" should be determined similarly and *with the identical evidence as was admitted in the underlying action. The issues in the "retrial" of a case should be limited only to those errors that were the alleged*

> consequence of the attorney's negligence.  The objective is not to retry the
> underlying case but to decide whether the attorney's error prevented the
> proper result.

Mallen, at § 35.12, page 1216–17 (2009 ed.) (Emphasis supplied.)

The principle that the underlying case should be tried only to the extent necessary to determine whether there is a sufficient causal connection between an attorney's error and the proper result is illustrated by *Morris v. Getscher*, 708 F.2d 1306 (8th Cir. 1982).  In the underlying litigation, attorney Getscher had represented Morris in a suit against AID Insurance Company, Morris' property insurance carrier, for refusing to pay Morris on the loss of a building in a fire.  The insurer defended by invoking a policy exclusion preventing an insured from recovering a loss if the insured procured the burning.  The underlying case went to trial, and the jury rendered a verdict in favor of the insurer.

Morris sued Getscher for malpractice, arguing that Getscher was "negligent in pretrial investigation and preparation, failing to call or depose certain witnesses, preparation of witnesses, coss-examination of witnesses, and his failure to file suit on the contents policies within the limitations period contained in the policies," *Id.* at 1308. "The trial court instructed the jury that Morris had the burden of proving, by a preponderance of evidence, that he would have been successful in the original suit were it not for Getscher's negligence, and that the jury must decide, based upon the evidence presented in the [malpractice] case, whether Morris would have been successful in the action against AID Insurance had the defendants exercised reasonable care and diligence in prosecuting the lawsuit.  The court also instructed the jury: 'If you find by a preponderance of the evidence that the fire was of incendiary character and that it was caused or procured by [Morris] regardless of any negligence on the part of defendants here, your verdict must be for the defendants.'" 708 F.2d at 1310–11.

The Eighth Circuit held these instructions to be plain error, reasoning as follows:

> These instructions may have incorrectly given the jury the impression that it
> was free to redecide the arson issue without limiting its consideration to only
> the evidence presented by Morris at the malpractice trial which, due to
> appellant Getscher's negligence, was not presented in the insurance trial. In

> other words, the court's instructions failed to adequately inform the jury that in considering whether or not the fire was caused or procured by Morris, it was bound by the jury's findings on this issue in the trial on the insurance policy and *it could not consider new or different evidence unless that evidence was found to have been causally related to Getscher's negligence at the insurance trial.*

708 F.2d at 1311 (emphasis supplied).

The principle stated by Mallen and illustrated by *Morris* undercuts any contention by LGP that Phillips' non-ownership of the '798 Patent somehow is fatal to his legal malpractice claims. That is because the patent case was prepared, litigated through judgment against Phillips, and the disputes between Phillips and AWH thereafter settled without AWH (or Phillips' own lawyers, for that matter) ever relying on a patent ownership defense. Since the ownership defense was not relied upon by the defendants in the Patent Lawsuit, the issue is causally irrelevant in the malpractice case, because a latent or undiscovered fact cannot logically affect the question of whether the actual result would have been better for Phillips, but for LGP's negligence in preparing and presenting the case. Stated in the terms used by *Getscher*, the new evidence is not "causally related to [LGP's alleged] negligence." *Id.*

There is no authority, whether in Mallen or case law, of which Phillips is aware to support the different and more remarkable proposition LGP advances here: that a legal malpractice defendant may, assisted by hindsight and the passage of time (and aided by his own knowledge of his former client's vulnerabilities that may not have been considered by the defendant in the underlying litigation), resurrect ignored issues from the underlying tried case, assert additional defenses and conduct a better trial than did the underlying defendant — all to the end of proving that, had the underlying defendant and its lawyers prepared and presented a completely different defense than the one actually litigated, the result would have been better for the underlying defendant and worse for the underlying plaintiff, the former client.  The "ownership" issue is legally irrelevant to the negligence case against LGP, because defenses ignored by AWH are irrelevant to the presence or

59

absence of a causal connection between LGP's alleged negligence in the case actually presented and Phillips' damages.

> **B.    Because defects in Phillips' ownership of patent could have been resolved if the issue was raised at the time of the underlying case, summary judgment on causation is inappropriate.**

Precluding LGP from relying on an "ownership" defense that was not pursued by AWH is also warranted by the underlying facts (some of which my be disputed, precluding summary judgment on that ground alone).  Drawing all factual inferences in Phillips' favor, as the Court must in deciding this motion, there is significant evidence that AWH had knowledge of the Trust's interest in the Patent at the time of its relationship with Phillips and its subsequent infringement.  *See*, Phillips' Statement of Additional Disputed and Undisputed Facts ("Phillips SOF") at ¶ 7-9.  Yet, in spite of the fact that the Complaint in the Patent Lawsuit did not expressly allege that Phillips "owned" the Patent, AWH did not file a motion to dismiss or otherwise pursue a defense on "ownership."  To the contrary, by the time the Patent Lawsuit got to trial, neither LGP nor AWH identified "ownership" as a stipulated fact, included "ownership" as an element in the infringement instructions, or discussed "ownership" at trial.  *Id*. at ¶ 9. In spite of the knowledge AWH had from underlying communications with the Trust, in its role as a Defendant facing a Patent Infringement lawsuit AWH never pursued an "ownership" defense.

If, on the other hand, AWH had raised an "ownership" defense, that fact would not have defeated Phillips' claims in the underlying patent litigation because any defect could have been cured. While an action seeking money damages for patent infringement generally must be brought by the party who held legal title during the period of infringement, an assignee of the patent has the right to sue for pre-assignment infringement "where the assignment of a patent is coupled with an assignment of a right of action for past infringements." *Arachnid, Inc. v. Merit Industries, Inc.* 939 F.2d 1574, 1581 n.7 (Fed. Cir. 1991) (requiring "that the latter assignment must be express, and can not be inferred from an assignment of the patent itself."). Under this rule, Phillips could have cured

any defect by taking a re-assignment of the patents, coupled with an express assignment of the right to sue for all past infringements.  Unlike a situation where an interloper is attempting to claim infringement of a patent to which he is an intruder, here the trustee of the Trust has confirmed that he would have transferred any necessary interests to  Phillips if any of Phillips' lawyers had asked him to do so.  Phillips SOF at ¶ 3 and 4.

Other disputed factual issues should preclude summary judgment on this ground. It is beyond dispute that LGP had documents from Phillips' 1991 Bankruptcy – including the Creditor's Meeting transcript (LGP Ex. 4) which forms a predicate for their argument – in its own files at the time it represented Phillips. Phillips SOF at ¶5.  While Payne denies that LGP ever saw a folder in its own file marked "Bankruptcy," an inference can be drawn from the fact that LGP, which admittedly undertook a massive file review and reorganization, would have noticed documents that could have been fatal to their client's case, if they acted prudently.  Nonetheless, the fact that LGP waited until they were defending a malpractice action to present the issue suggests that LGP either believed that the bankruptcy issues were not material in the Patent Lawsuit, or, worse, believed that the issue was dangerous and chose to keep it quiet in the Patent Lawsuit and hold it in reserve to use against Phillips.  If either factual scenario were true in the eyes of the fact-finder, LGP's inequitable conduct would defeat this defense to liability.  The disputed issue of whether LGP knew of the "ownership" issue when it represented Phillips, by itself, should defeat LGP's argument.

## 5.   PHILLIPS' COUNTERCLAIMS AGAINST LGP ARE NOT BARRED BY STATUTES OF LIMITATION

In Sections V and XII(B) of the Motion, LGP provides the Court with citation to Colorado's two-year of statute of limitations for negligence and negligent misrepresentation claims (C.R.S. §13-80-102(1)(a)).  LGP next advises the Court of Colorado law holding that legal malpractice claims accrue when the client knows or should have known of the attorney's error, and that misrepresentation claims accrue on the date the recipient of the statement should have discovered its

falsity.  *See*, C.R.S. §13-80-108(3) (misrepresentation claims); *Broker House Intern., Ltd. v. Bendelow,* 952 P.2d 860, 863 (Colo. App.1998) (discovery rule for legal malpractice claims). LGP argues that it is inconceivable that Phillips' claims could have accrued any later than the last day of trial in March 2006, barring his counterclaims that were not filed until April 14, 2008.

LGP elects not to bring to this Court's attention – as it should have – that the applicable statute of limitation for Phillips' counterclaims is not C.R.S. §13-80-102.  Rather, because Phillips has pursued his claims against LGP **only** as compulsory counterclaims after LGP first filed a claim against him for enforcement of an attorney fee lien, the applicable statute of limitations is found at C.R.S. §13-80-109: "A counterclaim or setoff arising out of the transaction or occurrence which is the subject matter of the opposing party's claim shall be commenced within one year after service of the complaint by the opposing party and not thereafter."  The purpose of the statute of limitations at §13-80-109 "is to allow a party against whom a claim has initially been asserted to plead a stale claim only in response to the claim asserted against that party and only if it arises out of the same transaction or occurrence, or the same series thereof."  *Duell v. United Bank of Pueblo*, 892 P.2d 336, 340-41 (Colo. App. 1994).

Under Colorado law, a legal malpractice claim against an attorney seeking to recover a fee for the same representation is a compulsory counterclaim:

> Other jurisdictions have used [the logical relationship] test in concluding that a legal malpractice claim arising from the same representation as an action to collect attorney fees is a compulsory counterclaim in the fees action.  *See Law Offices of Jerris Leonard, P.C. v. Mideast Sys.*, Ltd., 111 F.R.D. 359, 361 (D.D.C. 1986) ("[I]t is hard to imagine a clearer compulsory counterclaim to a complaint for failure to pay legal fees than a legal malpractice claim stemming from the handling of the litigation for which fees are sought.") . . . . We consider these cases well reasoned and note that Allen cites no contrary authority.

*Allen v. Martin*, 203 P.3d 546, 556 (Colo. App. 2008) (citations omitted). As Phillips' counterclaims against LGP all arise from the same professional relationship and representation that form the predicate for LGP's claims against him, the counterclaims are governed by Colorado's "revival" statute of limitations at C.R.S. §13-80-109.

The material facts are not in dispute.  LGP filed its initial fee claim against Phillips in the Patent Lawsuit on April 20, 2007 [PL Doc. #362], and Phillips responded with his "provisional" counterclaims against LGP within the year – on April 14, 2008 [PL Doc. #490].  Phillips' Facts ¶62. The Court in the Patent Lawsuit dismissed LGP's fee claims and Phillips' counterclaims for lack of jurisdiction on September 4, 2008 [PL Doc. #516], triggering the application of C.R.S. §13-80-111 providing for a 90 day period to reassert the counterclaims after an involuntary dismissal.  *Sharp Bros. Contracting Co. v. Westvaco Corp.*, 817 P.2d 547, 551 (Colo. App. 1991) ("13-80-111 reflects a legislative intent to enable litigants to avoid hardships which might result from strict adherence to the provisions of statutes of limitations [and where the claimants] pursued their claims diligently, and defendants had knowledge of the claims, a liberal interpretation of the statute should be applied.").  Phillips re-filed the counterclaims in this case on September 18, 2008 [Doc. #68].  As C.R.S. §13-80-109, rather than §13-80-102, is the controlling statute of limitations for Phillips' compulsory counterclaims, LGP's request to dismiss the counterclaims as time barred should be denied.

## 6.   THE DEADLINE TO DISCLOSE EXPERT WITNESSES ON LGP'S LIABILITY HAS BEEN STAYED BY THE COURT.

In Section VI, LGP provides a legal argument that, under Colorado law, a legal malpractice claimant must prove the malpracticing attorney's standard of care through expert testimony.  Phillips does not dispute this statement of law as a general matter.  LGP then argues, incorrectly, that Phillips' expert disclosures were due on August 20, 2009, and that Phillips is now barred from submitting expert opinion on LGP's standard of care.

Once more, LGP elects to provide this Court with only selective information.  As detailed in Phillips' Statement of Facts at ¶¶ 71-76, prior to the Rule 26(a)(2) due date, Phillips filed two motions to stay the case, and both specifically requested staying the expert witness disclosure deadlines.  *See*, Doc. #285 and Doc. #286.  The Court granted Doc. #285, Phillips' Motion for Stay of Pre-trial Disclosure and Discovery Deadlines and Procedures in Light of the Recommendation of

United States Bankruptcy Court Judge Brooks, ordering that: "All pretrial disclosure and discovery deadlines are STAYED pending a ruling by Judge Brooks in the Bankruptcy Court. After such a ruling is made, I will then reassess the issue of a stay." Doc. #294 at page 4. Additionally, the Court stated in that order that the parties were to brief the Motion to Dismiss without Prejudice, and the Motion to Stay pending the resolution of the Motion to Dismiss, "so that a ruling can be made expeditiously [on the second Motion for Stay] after Judge Brooks has ruled in the bankruptcy proceeding ." *Id.* Although LGP chooses to ignore the fact that this Court issued an order staying pre-trial disclosure deadlines in this case in light of the Bankruptcy proceeding **initiated by LGP**, the fact remains that the Court's stay of pre-trial disclosure deadlines should defeat this portion of LGP's Motion.

### 7.   LGP IS RESPONSIBLE FOR ITS OWN NEGLIGENT ACTS AND OMISSIONS IN PREPARING AND TRYING THE PATENT LAWSUIT

In Section VII of the Motion, LGP presents a cryptic argument with no legal authority seeking judgment on a claim – that LGP is vicariously liable for Manthei's negligence – that Phillips has not asserted. In his Counterclaim against LGP, Phillips alleges that as his attorneys from the fall of 2005 through November 2006, LGP owed him a duty of care, and breached that duty in significant respects in its trial preparation and trial presentation, resulting in damages. Counterclaim [Doc. #68] at ¶¶ 50-53. Phillips has offered in his Statement of Facts above support for these allegations. *See*, Phillips SOF at ¶¶ 16-17, 23-28, and 29-57. To the extent that this argument is based on a factual dispute as to the material facts alleged in the Counterclaim as well as Phillips' Response to LGP's Statement of Facts ("Response to LGP SOF") and his own Statement of Facts, summary judgment cannot be appropriate. *Anderson.,* 477 U.S. at 248-50.

Although Phillips should not be forced to make LGP's argument for it, a review of Section VII could lead to a reasonable assumption that LGP's real argument is that Phillips cannot show that LGP owed it any duty of care to Phillips that can be related to or arise from the Patent Lawsuit, or

Manthei's work on the Patent Lawsuit.  While this reading of LGP's argument may, on its face, seem ridiculously over broad, the final sentence of Section VII states: "To the extent, therefore, that Phillips's counterclaims for professional negligence are based on alleged acts or omissions that occurred before LGP was retained as Phillips's counsel, LGP is entitled to summary judgment on these counterclaims."  Motion at 39.  This suggest that LGP's unstated argument is actually that it cannot be liable for any of its own conduct in its representation of Phillips because it either had no duty, or breached no standard to provide reasonable care, on any issue arising from anything in which Manthei was involved prior to LGP representing Phillips.  Given that Manthei represented Phillips from 1996 until November 2005, LGP's seemingly innocuous argument that it is not vicariously liable for Manthei goes to far.

The facts set out both in LGP's Motion, and in this Response can leave no room for dispute that LGP represented Phillips from the fall of 2005, through trial and into November 2005.  The law is plain: "An attorney owes to his client the duty 'to employ that degree of knowledge, skill, and judgment ordinarily possessed by members of the legal profession in carrying out the services for his client.'" *Id. Bebo Construction Co.,* 990 P2d at 83.  LGP owed Phillips a duty to carry out its services in preparing his case for trial, and trying the case, with a level of knowledge, skill and judgment commensurate with like lawyers. To the extent that LGP is making an argument that it owes no duty to its former client, LGP offers no legal authority in Section VII to establish that proposition, and, therefore, such a motion should be denied.   The standard of care imposed by that duty on an attorney is established by expert testimony. *Boigegrain v. Gilbert,* 784 P.2d 849, 850 (Colo. App. 1989).  As noted in the previous section, the deadline to disclose expert testimony on LGP's standard of care has been stayed by this Court. [Doc. #294].  To the extent that LGP's motion is claiming that it could not have violated its standard of care, before Phillips has even offered opinion evidence on the scope of the standard, LGP's argument is premature as set forth in the previous section.

The undisputed facts are that LGP solicited this case, failed to prepare it for trial, failed to make any effort to adapt their trial strategies to the contours of the case before it, failed to make any reasonable effort to improve the case they had seized, failed to understand the case, failed to try the case in a reasonable manner, yet still continues its efforts to take more than 40% of the fund paid to Phillips by AWH **after** the Court concluded that LGP failed to put any evidence into the record that could support any verdict.  In spite of these facts, in this purely argumentative portion of their Motion LGP asks this Court to find, with no legal authority whatsoever, that it should be immune from liability to Phillips for its own conduct because any problems with the case were Manthei's fault, leaving them free to engage in the most sub-standard work at every opportunity with no risk of consequence.  LGP's unsupported argument should be disregarded by this Court.

**8.     EVEN IF PREDECESSOR COUNSEL WAS NEGLIGENT, LGP CANNOT USE THAT NEGLIGENCE TO EXCUSE ITS OWN NEGLIGENT ACTS AND OMISSIONS, AND LGP'S NEGLIGENCE, TOGETHER WITH THAT OF PREDECESSOR COUNSEL, WAS A PROXIMATE CAUSE OF INJURY TO PHILLIPS**.

LGP's motion relies heavily on the notion that the acts and omissions of which Phillips complains occurred before it became Phillips' counsel, that there was nothing LGP could reasonably have done to right a badly listing ship after it took the helm, and that predecessor counsel's acts and omissions, not its own, were therefore the cause of any injury to Phillips.  Motion at 37–46.  Because LGP's factual analysis is incomplete, it is misleading.  Before discussing what LGP, acting as competent, reasonable successor counsel, should have done to right the ship, it is therefore necessary to recite the rest of the story.  When the Court gets the rest of the story and considers what LGP could have done to right the ship, it will be apparent that the court in the underlying patent case should, and would, probably have exercised its discretion to allow a continuance of trial, permit supplementation of expert reports and, if necessary, grant limited discovery.

### A.    The Rest of the Story.

LGP commences this part of its motion with the naked assertion that it "was retained by Phillips on December 9, 2005." Motion at 37.  Since it is undisputed that trial was set to commence February 27, 2006 (Motion at 12, LGP's Statement of Facts at ¶ 55 [hereinafter, "LGP SOF"] *admitted, supra,* Response to LGP SOF at ¶ 55, LGP is trying to severely truncate the period of its responsibility and to imply that it had eighty days to prepare this patent case for trial — a period which obviously included the holiday season.  The full truth is that LGP solicited Phillips' business and began working on the case no later than September 19, 2005. (Phillips SOF at ¶ 16).  LGP began making narrative billing entries for its time no later than October 3, 2005 (Phillips SOF at ¶ 17), and those entries referred to Mr. Phillips as LGP's "client." (Phillips SOF ¶ 23.)  Significantly, LGP was reviewing the "Expert Report Summaries regarding deficiencies and usability" and studying other issues in the case by October 5, 2005.  *Id.*  It was also analyzing issues related to a possible stay of the case.  *Id.*  It is a reasonable inference that its analysis of the stay issue was sufficiently detailed to permit its prompt filing of a Response opposing AWH's motion to stay all proceedings pending Supreme Court action on AWH's certiorari petition to review the Federal Circuit's *en banc* ruling in the case.  Its Response (of which, more below) was filed December 13, 2005, *id,* ¶ 25 — two days before it entered its formal appearance.  Given the convoluted nature of LGP's Contingent Fee Agreement, LGP s Ex. 25, it is hardly surprising that the formal arrangement between lawyer and client was not executed until December 9, 2005, effective November 29, 2005.  At this stage in the proceeding, Mr. Phillips is entitled to the factual inference that there was an attorney–client relationship no later that October 5, 2005, when LGP's own billings call him a "client."  *See generally* RESTATEMENT (THIRD) LAW OF LAWYERS § 14 (2000) (lawyer-client relationship arises when client manifests intent that lawyer provide legal services and lawyer manifests consent to do so).

There is also more to the story about the landscape of the underlying case that LGP confronted when it began representing Mr. Phillips in October/September, 2005. True, the discovery cutoff passed without a request for extension or other fanfare on December 1, 1997, and Mr. Phillips supplemented his expert report and completed his deposition in January, 1998. After that, however, the claims construction process was the court's and parties central (though not exclusive) concern until August 2, 2005 (when the Federal Circuit issued the mandate sending the case back to the district court). Specifically, during this seven-and-one-half year span, the district court held a claims construction hearing and subsequently issued its claims construction order on November 22, 2002. (LGP SOF ¶ 37, *admitted*, Phillips Response to LGP SOF ¶ 37.) Believing that the *Markman* ruling reconfigured critical parts of the case, AWH asked the court for a limited reconsideration of its pre-*Markman* denial of AWH's motion for summary judgment. Evidently agreeing that the *Markman* ruling had undermined aspects of Mr. Phillips' case, his former counsel inartfully confessed the request for reconsideration, for purposes of facilitating an appeal of the district court's claims construction. The court granted the request on January 23, 2003. *See* LGP's Exs. 17, 18, 19.

Because the Federal Circuit had the case until August 4, 2005, there was no further trial court action. LGP started representing Phillips a little over a month after remand. Although the case was over eight years from its birth, the Federal Circuit had transformed it by major surgery. It was not the same case which had lain dormant in the district court for two-and-one-half years. Some differences (for example, construction of the term "baffles") were palpable, because they were expressly addressed; others (for example, whether the rules articulated by the Federal Circuit required review of the term "substantially parallelepiped" or "end closures") needed to be developed and argued in an orderly fashion. It was apparent to the parties and the court that the discovery and disclosures needed to be taken from storage and dusted off. The court's orders reflect a recognition that updates— supplementation of expert reports, for example — might be needed. The court initially ordered supplementation by September 28, 2005 (subsequently extended to October 3, 2005).

(LGP's Exs. 22, 23).  Contemporaneously, (October 5, 2005) LGP's billing records reflect LGP's review of issues regarding the deficiencies and usability of expert reports.

Two events complete the whole story and illustrate the truly precarious position of the imminent trial setting and AWH's concession that limited discovery might be acceptable.  Both involved issues about delaying the trial date and/or accommodating the need for limited supplementation and discovery — issues which (1) handed to LGP the basis for gaining more time and/or supplementing its own discovery but (2) were, inexplicably, *opposed* by LGP.  First, on November 15, 2005, AWH asked the district court to stay proceedings pending the Supreme Court's disposition of AWH's petition for certiorari review of the Federal Circuit's ruling.  (Phillips SOF ¶ 25.)  Rather than meet-and-confer to see if there could be a joint request for continuance which would accommodate the needs of both parties, LGP filed a response to LGP's request, quibbling that the proposed stay would be open-ended and too long.  *See id.* & supporting citations.  Instead, LGP filed its own request for a continuance, which AWH, in tit-for-tat fashion, opposed on the ground that the requested continuance would be too long.  See [PL Doc. #238 (filed Jan. 4, 2006)].

Second, rather than extracting the log from its own eye by studying and supplementing its own disclosures, LGP filed a motion *in limine* seeking to preclude AWH's damage expert from testifying at trial.  In opposing the motion on January 17, 2006, AWH stated, "Further, more than five weeks remain until trial and AWH could make [the expert in question] available for deposition, should plaintiff choose to take such deposition and cure any alleged prejudice or surprise."  Phillips SOF at ¶ 27 & citations therein.  Instead of pouncing on this suggestion and negotiating for mutual supplementation of the Phillips and Wirkler disclosures (with depositions, if necessary), LGP, perhaps still oblivious to its looming disaster, replied that AWH's effort to supplement its experts before trial was "untimely and prejudicial to the Plaintiff."  *Id.*

B.        **Righting the Ship**

The whole story having been recited, it is apparent that LGP had a range of options to right Mr. Phillips' ship. For starters, LGP, with Mr. Phillips consent, could have wrested control from Manthei and entered its appearance far earlier than it did. Surely a reasonable lawyer should have recognized the importance of not allowing responsibility for the case to drift. Replacement counsel should realize that prior counsel, uncertain whether he is to be replaced, may slacken. As stated above, LGP was Phillips' counsel and was aware of potential problems concerning expert supplementation at about the same time that the deadline for supplementation was expiring. A reasonable lawyer would have tried to do something about the problem — at a minimum calling Manthei's attention to the problem.

Setting aside the factual issue of when LGP began to bear responsibility as Mr. Phillips' counsel and whether it should have taken control earlier, all was certainly not lost when it did belatedly enter its appearance. Nonetheless, LGP apparently made no attempt to work with opposing counsel or with the court to seize opportunities or timely deal with problems, until it was too late. The position it took concerning AWH's motion to stay is a prime example. A reasonable lawyer should have known, given the timing of LGP's appearance, that any sort of trial continuance would logarithmically improve its opportunity to prepare and tighten its case. Rather than contacting opposing counsel and negotiating an agreed motion which could be presented to the judge for consideration, LGP opposed AWH's own motion, filed its own, and generated a tit-for-tat response from AWH. Given the substance of each motion, a reasonable judge could ignore the quarrel as last-minute tactical maneuvering which need not be taken seriously. A similar example is the position LGP took to exclude AWH's damage expert, discussed above. Even if, for some reason not apparent on the record, it had not reached complete accommodation with AWH on all of these issues, it could have timely requested relief from the court, pointing out AWL's failure to agree (even while AWH requested similar relief), and asking the court for an expedited ruling.

C.   **Given the Whole Story, the Patent-Case Court Probably Would, and Should, Have Exercised Its Discretion to Afford Pre-Trial Relief Which Would Have Avoided the Sanctions It Imposed at Trial.**

Phillips acknowledges that the questions of (1) whether to grant a request for continuance, (2) whether to allow supplemental disclosure of expert reports and the bases therefore, and (3) whether to permit limited discovery are all addressed to the discretion of the trial court.  Appellate courts, however, have identified considerations which govern exercise of this discretion, among them the timing of the request for relief, whether there would be incurable prejudice to the opposing party, and any inconvenience to the court and participants in the process. In considering whether to grant a motion to continue a trial, the court should consider various factors such as:

> (1) the diligence of the party requesting the continuance;  (2) the likelihood that the continuance, if granted, would accomplish the purpose underlying the party's expressed need for the continuance;  (3) the inconvenience to the opposing party, its witnesses, and the court resulting from the continuance;  (4) the need asserted for the continuance and the harm that appellant might suffer as a result of the district court's denial of the continuance.

*United States v. Diaz*, 189 F.3d 1239, 1247 (10th Cir. 1999).  Similarly, a court exercising its discretion with respect to requests concerning extending discovery deadlines considers a number of factors:

> 1) whether trial is imminent, 2) whether the request is opposed, 3) whether the non-moving party would be prejudiced, 4) whether the moving party was diligent in obtaining discovery within the guidelines established by the court, 5) the foreseeability of the need for additional discovery in light of the time allowed for discovery by the district court, and 6) the likelihood that the discovery will lead to relevant evidence.

*Sil-Flo, Inc. v. SFHC, Inc.*, 917 F.2d 1507, 1514 (10th Cir. 1990).

In applying these factors, it is apparent that an *agreed* motion to continue a trial, or an *agreed* motion to permit limited discovery or supplementation stands on a far different footing than one which is contested. It eliminates from the calculus any requirement that the court address whether relief would prejudice or inconvenience to the other party or its witnesses, or whether the motion is

71

opposed.  Had LGP consented to AWH's request for a stay (perhaps negotiating on whatever was concerning LGP about the request) and presented it in December in a timely manner, the court should have exercised its discretion to grant a stay/continuance.  The request could have been bolstered by pointing out the recent remand from the Federal Circuit and  counsel's recent entry of appearance, in addition to the pendency of AWH's certiorari petition.

It is even clearer that a timely request to supplement expert opinions should, and would, have been granted if timely made.  AWH had already taken the position that it would agree to a deposition of its own expert as late as January, and it would be reasonable to expect some reciprocity if a parallel request and offer had been made by LGP.

LGP either failed to recognize these trial preparation problems or to work around them.  As experienced trial lawyers and courts know, final trial preparation frequently involves (1) recognizing problems with discovery or gaps in discovery and (2) devising strategies to address them.  LGP simply did not do this, even though it had ample time to do so.  The consequences of this failure manifested themselves at trial, when the options for addressing the problems had narrowed, both for Phillips and for the trial court.  These consequences were exacerbated by LGP's negligent and inadequate trial presentation, which led ultimately to the court's granting judgment as a matter of law to the patent defendants.  That presentation is the next topic.

As noted above, Phillips disagrees with LGP's contention that whether he can prove that a reasonable judge should not have granted the pre-trial relief discussed above, or the JMOL discussed below, if LGP had met its standard of care is a question of law for the Court. Instead, these causation question should be resolved by a jury, making this issue inappropriate for summary judgment in the first instance.

Nevertheless, even if this Court concludes that the causation issues raised by LGP are questions of law that it can decide (because the "harm" allegedly resulting from the alleged breaches of care were decisions made – or for that matter not made – in the underlying case by the court and

not the jury), this Court still must apply the standard that Phillips need show causation only by a preponderance of the evidence. *Kaiser*, 741 P.2d at 719. Contrary to LGP's position, Phillips need not show that, absent LGP's errors, he absolutely would have been able to make an argument that absolutely would result in the requested pre-trial relief or put evidence in the record that absolutely would have persuaded Judge Krieger not to grant a JMOL. Instead, for Phillips to satisfy causation, he need only show that the arguments and facts available to be submitted to the Court pre-trial, or evidence was available to be submitted into the Patent Lawsuit record that, more likely than not, should have led a reasonable judge to grant the requested pre-trial relief or to deny a Fed.R.Civ.P. 50(a) Motion.

## 9.   IF LGP HAD NOT BEEN NEGLIGENT, THE JMOL SHOULD NOT HAVE BEEN GRANTED

In resolving this argument, as well as the arguments concerning pre-trial conduct and jury instructions, it is importance to note that LGP does not argue (here) that Phillips cannot show that LGP breached a duty of care with regard to the admission of more evidence. Because LGP argues only a causation issue (as standard of care clearly is a disputed fact for a jury to decide) in this motion, it must concede that all Phillips need do to defeat this part of the Motion is "show what this specific evidence [to sustain the verdict] was, that it was available to LGP at time of trial, that it should have been admitted, and that its admission should have led the Court to deny JMOL." Motion at 52. It is not surprising that LGP – having failed to understand the case, having failed to adapt the case to its circumstances, and having failed to competently present it at trial – does not argue (here) that Phillips need show that it failed to do what a reasonable attorney would have done to present a more "JMOL resistant" case for its client.

In the United States District Court for the District of Colorado a Rule 50 motion:

"should be cautiously and sparingly granted." *Lucas v. Dover Corp.*, 857 F.2d 1397, 1400 (10th Cir.1988) (citations omitted). [The court] cannot pass judgment on the credibility of witnesses or substitute [its] judgment for that of the jury. *See Hinds v.*

> *General Motors Corp.*, 988 F.2d 1039, 1045 (10th Cir.1993). Judgment as a matter of law is appropriate "only where the proof is all one way or so overwhelmingly preponderant in favor of the movant so as to permit no other rational conclusion." *Id.*

*U.S., ex rel. Maxwell v. Kerr-McGee Oil & Gas Corp.*, 2009 WL 3161828, 5 (D.Colo. 2009). Applying this standard to the JMOL entered in the Patent Lawsuit [LGP Ex. 49] hones the causation standard to apply to an allegation that LGP's failures resulted in a worse result on a JMOL Motion: *if* it can be shown by a preponderance of the evidence that a reasonable attorney could have submitted evidence at the Patent Lawsuit trial to, more likely than not, persuade a reasonable judge that the evidence in the Patent Lawsuit record was not so overwhelmingly in AWH's favor so as to permit no rational conclusion other than a finding of non-infringement, *then* LGP's Motion for Summary Judgment fails.

The resolution of this argument, by design, is wholly fact dependant and requires this Court's full immersion into the details of the underlying case, as well as the additional evidence that could have been submitted therein. This Court's practice standards are not particularly tolerant of the approach foisted on the Court and Phillips by LGP. Given the limitations on presenting facts in the body of this Response, not to mention space limitations, Phillips responds by requesting that the Court study the JMOL Order [LGP Ex. 49] that is based on two findings: (1) that there was not sufficient evidence to support a jury finding that AWH's "end closures" were equivalent to the patented "end closures," preventing a finding of infringement of Claims 22, 24 and 26 of the Patent, and (2) that there was not sufficient evidence to support a jury finding that the "insulating material" in AWH's allegedly infringing panels was, on its own, "impact resistant," preventing a finding of infringement of Claim 21 of the Patent. Phillips SOF at ¶¶45-46 (court's analysis of the deficiencies in the "end closure" evidence) and 53-54 (deficiencies in "insulating material") evidence. Among the specific evidentiary deficiencies highlighted in the JMOL order was: that (1) LGP offered only Phillips' conclusory statements about the equivalence of the "end closures" on the first three jails; (2) LGP failed to place in the record drawings made at trial, or offer any other evidence of how the

"end closures" even functioned on the second four jails, which the Court held was enough on its own to warrant judgment in AWH's favor on the "end closure" issue, (3) LGP offered only Phillips' conclusory statements about the equivalence of the "end closures" on the second four jails, and (4) LGP failed to offer any evidence at all about the whether the properties of the insulating material used in the infringing jails could resist bullets, exploding projectiles and bomb fragments.  LGP Ex. 49 at 8-21, Phillips SOF at ¶¶45-46.

LGP's argument that there was no such evidence available to put into the record at trial, or that Phillips should be limited in this case to statements made in written discovery responses, reveals just how unprepared LGP and its attorneys Mollick and Payne  were to present this case in February 2006.[3]  In spite of the limitations on discovery and disclosure LGP may have faced in the Patent Lawsuit – of which it should have been aware, and which it should have adapted around instead of failing to prepare and then complain here that Manthei handed it an unwinnable case – Edward Phillips himself possessed an extraordinary amount of knowledge that he would have testified about in the case on the issues of "end closures" and "insulating materials" if LGP had only asked.  Exhibit A-17, Phillips Affidavit at ¶¶ 5-7.  Phillips' knowledge was based on the documents disclosed by AWH in discovery that were available for admission (by calling the correct foundation witnesses) at trial; on his inspections of the infringing jails if LGP had simply disclosed those visits weeks before his testimony, rather than at trial, to avoid the harsh sanction of exclusion (*see*, Phillips SOF at ¶¶36-40); or on his personal experience gained working with AWH's employees at AWH's facilities in 1989 and 1990 for the purpose of applying the function of the Patented panels to AWH's manufacturing needs.

---

[3]      Phillips should not be limited to interrogatory responses submitted in this case as the discovery cut-off has not occurred, the deadline to supplement discovery has not occurred, and, discovery has been stayed [Doc. #294].  LGP's argument is proof that its Motion is premature.

Phillips' Affidavit [Exhibit A-17] is, essentially, an Offer of Proof on what his testimony should have been at the underlying trial if LGP had acted reasonably. Based on adequate and admissible foundation handled by an attorney familiar with the rules of evidence and trial practice (*See*, Phillips SOF at ¶43.1), Phillips should have offered the type of testimony set forth in ¶5.a of his affidavit to provide sufficient evidence of how the "end closures" in the second four jails were configured (¶6 reveals that Phillips no longer recalls the precise drawings he made at trial to illustrate this issue, and that Mollick choose to delete instead of admit those drawings into the record), and ¶5.b of the affidavit to provide sufficient evidence on the configuration of the "end closures" in the first three jails. Phillips then should have provided the testimony set forth in ¶5.c of the Affidavit to provide sufficient non-conclusory evidence to support a jury's finding that the "end closures" in both sets of jails were equivalent in function, manner and result to the Patented "end closures." Additionally, as set forth in detail in ¶7 of Exhibit A-17, Phillips should have testified, again from his jail inspection, his review of documents and depositions, or from his personal experience including the years he spent working with AWH and the years he spent designing and testing security panels, that the high density insulation board used by AWH in its infringing panels provided greater impact resistance than the steel used to enclose the insulation, and that the insulation had properties on its own to "resist" bullets, exploding projectiles and bomb fragments.

To a preponderance of the evidence, the information that LGP should have placed into evidence from just from its own client, if LGP had only properly understood, prepared and presented this case, should have been sufficient to cause a reasonable judge to uphold a jury verdict over a Motion for JMOL.

## 10.    LGP IS NOT ENTITLED TO SUMMARY JUDGMENT ON PHILLIPS' CLAIM THAT LGP NEGLIGENTLY CAUSED HIM DAMAGE BY FAILING TO OFFER EVIDENCE TO SUPPORT AM "ENTIRE MARKET" DAMAGE INSTRUCTION

Had LGP properly developed and presented Mr. Phillips' own testimony, the damages recovered would not have been measured narrowly with reference to sales of the patented apparatus

alone.  Instead, the damages would have been based on total sales of ancillary apparatus normally sold together with the patented apparatus.  The legal theory broadening the basis for measuring damages is called the "entire market value rule."  *Rite-Hite Corp. v. Kelley Co*., Inc., 56 F.3d 1538, 1549 (Fed. Cir. 1995).  Contrary to LGP's argument (Motion at 47), the rule is not limited to situations where the patented and un-patented goods are physically a part of the same device, or where the they are analogous to a single functioning unit.  The test, rather, is whether the patented and un-patented goods are tied together as a matter of finances and marketing.  As the Federal Circuit has explained:

> The entire market value rule allows for the recovery of damages based on the value of an entire apparatus containing several features, *when the feature patented constitutes the basis for customer demand*. [Citations omitted.]  It is the " 'financial and marketing dependence on the patented item under standard marketing procedures' which determines whether the non-patented features of a machine should be included in calculating compensation for infringement." *Kori Corp. v. Wilco Marsh Buggies and Draglines, Inc*., 761 F.2d 649, 656, 225 USPQ 985, 989 (Fed.Cir.), *cert. denied*, --- U.S. --- (1985). . . . In establishing lost profits, "[t]he deciding factor . . . is whether '[n]ormally the patentee (or its licensee) can anticipate sale of such unpatented components as well as of the patented' ones." *Paper Converting Machine Co.*, 745 F.2d at 23, 223 USPQ at 599 (*quoting Tektronix*, 552 F.2d at 351, 193 USPO at 393).
>
> . . . .
>
> Where a hypothetical licensee would have anticipated an increase in sales of collateral unpatented items because of the patented device, the patentee should be compensated accordingly.

*TWM Mfg. Co., Inc. v. Dura Corp*., 789 F.2d 895, 901 (Fed. Cir. 1986) (emphasis supplied).

As Mr. Phillips' attached affidavit declares, he could have supplied the facts supporting an entire market value approach, had only he been asked.  Phillips' Ex. A-17 at ¶8.  Based on his own experience in the building of modular jails, he knows that purchasers of modular jail units, such as those covered by Mr. Phillips' patents, expect and demand that the units include non-patented features such as toilets, sinks, mirrors, bed platforms, and plumbing/electrical components.  Even though they are un-patented, these features, when installed in jails, are not separate, off-the-shelf

items. *Id*. at 8.c. The patented and un-patented goods are marketed and sold together. Moreover, "[w]hether a patentee could anticipate additional income from the auxiliary parts is a question of fact." *Paper Converting Machine Co. v. Magna-Graphics Corp*,. 745 F.2d 11, 23 (Fed. Cir. 1984). It should thus have been presented to the jury under a proper carrying instruction.

LGP apparently advances two arguments against this conclusion. The first is based on LGP's contention during an instructions conference in the patent case that "several witnesses" had testified about the relation between the "collateral goods" and the patented apparatus. Phillips Exhibit A-4 at vol. VIII, at 1193. Neither in that conference nor in the motion for summary judgment does LGP develop this contention, mention the witnesses, or explain how their evidence supported the entire market value approach. Instead, LGP now concedes that its argument "did not respond to [the patent defendant's] principal objection to the proposed instruction." Motion at 48. What was lacking is the concise but unsought testimony which Mr. Phillips could have supplied. Had it been available, it is probable that it would have provided the decisive evidence justifying submission of the "entire market value" damages theory to the jury under a proper instruction. LGP's second argument to justify its inadequate presentation of the "entire market value" theory of damages is premised on the contention that, even if evidence had been properly presented, it would not have altered the patent-case court's discretionary refusal to give a specific damage instruction on the topic. As an initial matter, the argument mis-states the record. Implying that the court had other, separate reasons for refusing such an instruction, LGP quotes the court's observations that it did not ordinarily "instruct on theories" and that "the instruction doesn't really provide the jury with any useful information." Motion at 49. A careful reading of the transcript, however, demonstrates that the court, when making these observations, had already ruled on the "entire market value" damage instruction. Phillips' Exhibit A-4 at vol. IX. at 1222:20 – 1124:2. The quoted remarks addressed a separate instruction. *Id.*, at 1224–25.

78

Aside from mis-stating the record, LGP's argument conflates the standard by which an appellate court reviews a jury instruction and the question of whether LGP's failure to supply an evidentiary basis for the instruction caused a reasonable damages to the firm's former client.  LGP recites familiar law that an appellate court reviews omission of a particular instruction for abuse of discretion, so long as other instructions conveyed an adequate understanding of the law.  It does not follow that the omission insulates LGP's negligence in failing to supply a factual basis which would likely have changed a reasonable court's decision, and LGP cites no authority so holding.  Had LGP been better prepared to present the relevant testimony and to argue the significance of that testimony by referring to a specific jury instruction, the instruction would probably have been given, and damages would likely have been greater than they were.

11.    **LGP IS NOT ENTITLED TO SUMMARY JUDGMENT ON PHILLIPS' CLAIM THAT LGP NEGLIGENTLY FAILED TO DEVELOP AND PRESENT THE ARGUMENT THAT PHILLIPS COULD PROPERLY PURSUE CLAIM 1 OF HIS PATENT UNDER THE DOCTRINE OF EQUIVALENTS.**

In a short and confusing section of argument, LGP seemingly suggests that, because of unspecified but fatal weaknesses of Claim 1, that claim would never have seen the light of day at trial, no matter what LGP had done.  Thus, according to LGP, there is no causal connection between its negligent performance and Mr. Phillips' injury.  Motion at 51–52.  To support the argument, LGP "incorporates by reference the *motion to reconsider* the [sic] Judge Krieger's denial of AWH's summary judgment motion" in the underlying patent case.  *Id.*, at 52 & LGP Ex. 17 (emphasis supplied).  For the reasons stated below, this logic does not bear analysis, and it improperly asks this court to shoulder a burden which LGP must carry on a motion for summary judgment.  Moreover, as noted above, the jury rather than the Court should decide this causation issue. Even if the Court elects to resolve the issue, it would have to do so under a preponderance of the evidence standard, rather than  – as LGP suggests – resolving the underlying case motion to a final resolution.

The referenced motion to reconsider [LGP Ex. 17] was not a plenary motion for Judge Krieger to revisit multiple aspects of her earlier order rejecting the patent defendant's motion for summary judgment. The motion to reconsider was, rather, limited to a single discrete question: whether the court's subsequent claims construction order undermined her earlier denial of summary judgment. Ex. 17 at 1. Moreover, the request for reconsideration was specifically directed only to the court's construction of the term "baffles" and argued that, under the court's definition, Phillips could not prevail on a claim for literal infringement or under the doctrine of equivalents. *Id.*, at 2–8. LGP correctly states that "the motion was confessed in order to facilitate an appeal," but it is simply wrong in adding that the appeal was "on other issues." Motion at 51. The appeal plainly included the district court's construction of the term "baffle." Indeed, the Federal Circuit (in a decision issued merely seven months before trial of a case which had been pending for over eight years) rejected the district court's construction of "baffle," reversed, and sent the case back for trial. *Phillips v. AWH Corp.* 415 F.3d 1303, 1328 (Fed. Cir. 2005).

Given the procedural history recited above, LGP's suggestion that this court revisit the motion for reconsideration seems confusing, if not senseless. The motion raised a single issue — whether the district court's claim construction of the term "baffles" undermined the court's earlier summary judgment ruling. The Federal Circuit rejected the district court's construction of the term "baffles," undermining the very basis for reconsideration. LGP fails to explain how revisiting a motion for reconsideration premised on a claim construction rejected by the court of appeals could possibly be a productive use of this court's time – let alone a valid method for the Court to evaluate causation under a preponderance standard..

To the extent that LGP intends to go beyond AWH's narrow request in the motion for reconsideration and to invite this court's plenary review of AWH's summary judgment motion itself, its argument suffers from a defect parallel to its argument that Phillips should have lost the

underlying case because he did not own the patents:  against its former client, it seeks to use a weapon never wielded by the client's opponent and to improve on the opponent's case presentation and strategy.  Equally important, by its attempt to incorporate AWH's entire summary judgment motion and avoiding any explanation of its argument, it improperly asks this court to shoulder the burden of trudging through AWH's briefs and trying to discern LGP's logic.  The court should reject LGP's onerous invitation.  "Judges are not like pigs, hunting for truffles buried in briefs."  *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991).

12. **GENUINE ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON PHILLIPS' FRAUD AND NEGLIGENT MISREPRESENTATION CLAIMS.**

LGP argues that the fraudulent and negligent misrepresentations alleged by Phillips do not establish claims under Colorado law.  A review of the evidentiary materials referenced in Phillips Statement of Facts at ¶¶ legal standards as set forth in the Colorado Jury Instructions, however, establishes that there are genuine issues of material fact that preclude summary judgment.

The elements of a fraudulent misrepresentation claim under Colorado law are set forth in the Colorado Jury Instructions, Civil-4th at Sec. 19:1 as follows:

1. The defendant made a false representation of a past or present fact;

2. The fact was material;

3. At the time the representation was made, the defendant:

   (a) knew the representation was false; or

   (b) was aware that (he) (she) did not know whether the representation was true or false;

4. The defendant made the representation with the intent that (the plaintiff) (a group of persons of which the plaintiff was a member) would rely on the representation;

5. The plaintiff relied on the representation;

6. The plaintiff's reliance was justified; and

7. This reliance caused (injuries) (damages) (losses) to the plaintiff.

*See also*, *Knight v. Cantrell,* 390 P.2d 948 (Colo. 1964); *Morrison v. Goodspeed,* 68 P.2d 458 (Colo. 1937).

Colorado Jury Instruction 19:3 define a "false representation" as: ". . . any oral or written words, conduct, or combination of words and conduct that creates an untrue or misleading impression in the mind of another." The instruction cites as authority, *inter alia, Meredith v. Ramsdell,* 384 P.2d 941, 944 (Colo. 1963) ("[a] person who misleads another by word or act to believe that a fact exists, when he knows it does not, is guilty of fraud"); *Corder v. Laws,* 366 P.2d 369 (Colo. 1961) (creation of a false impression, by whatever means, is the gist of a false representation). Colorado Jury Instruction 19:12, (4th ed.), titled "Statements of Future Intention or Promises as False Representations" provides that "A promise to do something in the future is a false representation if the person making the promise did not intend to keep the promise when (he) (she) made it." *See*, *Brody v. Bock,* 897 P.2d 769 (Colo. 1995) (promise concerning future event coupled with present intention not to fulfill promise is actionable as fraud). Additionally, Instruction 19:13, "Statements About the Future as False Representations," states that "A statement about what (will) (or) (will not) happen in the future is a false representation only if it turns out to be false and the person making the statement: (1 claimed to have special knowledge to support the statement that he or she did not have;) (or) (2 had special knowledge that he or she failed to disclose and that he or she knew would make the future event unlikely to happen).

A claim for negligent misrepresentation is closely related to the legal framework for the fraud claim, as explained in Note 1of the Notes on use for Colorado Jury Instructions, Civil-4th at Sec. 9:4 "Negligent Misrepresentation Causing Financial Loss in a Business Transaction – Elements of Liability" as follows:

> This instruction rather than Instruction 19:1 should be used when the plaintiff's claim
> is that, while the defendant may have had an honest belief in the truth of what the
> defendant represented, the defendant was negligent in arriving at such belief or was

negligent in the manner in which the defendant communicated it, thus creating a false impression of the true facts in the mind of the plaintiff.

The same false representations that are the bases of the claims are the same, and LGP raises no arguments other than argument of counsel that the false representations – whether fraudulently or negligently made – do not constitute "false representations" under these standards.

To establish the existence of a genuine issue of material fact, the Affidavit of Edward Phillips (Phillips Exhibit A-17) sets forth misrepresentations made by LGP attorneys in conversations Mr. Phillips had with them in the fall of 2005 in which they persuaded Mr. Phillips to retained LGP as lead trial lawyers in the Patent Lawsuit.  Phillips Exhibit A-17 at ¶3.  As set forth in that Affidavit, representations regarding the expertise and  experience of Payne formed the basis of the decision by Phillips to hire the firm .  Specifically,"[o]ne important statement was that Payne had been the main trial lawyer in many complicated patent infringement jury trials not only in California but also in Alaska, Colorado and around the county."  *Id*. There is, additionally, a genuine issue of fact as the falsity of the fact.  In response to an interrogatory asking it to identify each *jury trial* at which Payne acted as either lead or assistant counsel at any time prior to the trial of the Patent Lawsuit, LGP did not identify *any* patent cases – other than *Phillips v. AWH* – in which Payne served as lead or assistant trial counsel.  Phillips SOF ¶21, Phillips Ex. A-18 at Response to Interrogatory 6.

Taking the Phillips Affidavit as true and accepting LGP's discovery response as an admission, there is a material factual dispute as to whether LGP made false representations concerning Payne's skill and experience in conversations that persuaded Phillips to hire LGP.  LGP provides a self-congratulatory Footnote 5 (Motion at 57) that the fact it obtained for Phillips a $1.85 million verdict *validates* its statements that it had the "resources and experience to properly try the case, and that it would be fully prepared to try the case if it did not settle." This footnote neither factually or legally cures the misrepresentations made by the firm.  Legally, the jury verdict does not alter the fact that LGP made a representation about Paynre's patent trial experience that its discover response proves

false.  Factually, it is defies comprehension that LGP still boasts about a $1.85 million verdict when the Court took the verdict away on a reserved JMOL motion for failure to present a sufficient case to support the jury's findings.  LGP's smug back patting is more troubling in light of the trial court's suggestion that the only reason she did not grant AWH's Rule 50(a) Motion at the close of Phillips' case was "because the manner in which the evidence has come in in this case is extraordinarily confused, and there have been numerous evidentiary rulings that have required the striking of portions of the evidence and precluding the jury from considering certain evidence [and quite] frankly, until I have a complete and correct transcript, I cannot determine what the record is as of the motion -- as of the time that the plaintiff rested." Phillips Exhibit A-4 at 1011:15-1012:3.

Whether addressing the claim of negligent misrepresentation or the fraud claim, the assertion that a false representation regarding the experience and expertise of the lawyer was a basis for the retention of the firm and the resultant damages suffered by Mr. Phillips is sufficient to defeat the motion for summary judgment.

**13.   LGP IS NOT ENTITLED TO SUMMARY JUDGMENT ON PHILLIPS' BREACH OF FIDUCIARY DUTY CLAIM BECAUSE: 1) IN COLORADO, THE TERMINATION OF THE ATTORNEY-CLIENT RELATIONSHIP DOES NOT EXTINGUISH ONGOING FIDUCIARY DUTIES OWED TO THE FORMER CLIENT, AND 2) THE MOTION IS PREMATURE.**

Phillips' Counterclaims allege that after Phillips terminated LGP, LGP breached continuing fiduciary duties owed to Phillips by refusing to consent to the settlement offered by AWH, refusing to release any lien claims against AWH, and  refusing to even negotiate in good faith regarding requests for its consent.[4]  Counterclaim [Doc. #6at ¶¶ 45-8, 58-61.  As a consequence of these breaches, Phillips lost the opportunity to settle with AWH for a greater amount and he sustained substantial losses.  *Id*.  These allegations clearly state a claim under Colorado law, and further, as

---

[4] Critically, the Counterclaim does not allege that LGP was asked to waive or limit its claim against Phillips, but rather that it was only asked to enable Phillips to settle the underlying litigation by waiving its claims against AWH, reserving all rights against Phillips.

argued above, LGP's Motion is premature as this case was stayed *before* the deadline for the submission of Phillips' Rule 26(a)(2) disclosures.

>   **A.   Under Colorado Law, an Attorney Owes Ongoing Fiduciary Obligations to the Client After the Termination of the Attorney-Client Relationship.**

LGP argues in its Motion for Summary Judgment that, as a matter of law, it owed no ongoing fiduciary duties to Phillips after the termination of the attorney-client relationship.  This argument misapprehends Colorado law and is, itself, a telling admission that in refusing to negotiate in good faith regarding its lien interests that prevented Phillips from being able to finalize the proposed settlement based on the Patent Defendants' offer, LGP was acting without any regard whatsoever for its continuing fiduciary duties owed to Phillips.

The "relationship between an attorney and client is a distinct fiduciary affiliation which arises as a matter of law."  *Olsen and Brown v. City of Englewood*, 889 P.2d 673, 675 (Colo. 1995); *see, Baily v. Allstate Insurance Co.*, 844 P.2d 1336, 1339 (Colo. App. 1992).  LGP's fiduciary obligation to Phillips included, among other things, a duty of undivided loyalty and  a duty of confidentiality. *Destefano v. Grabrian*, 763 P.2d 275, 284 (Colo. 1988); *see,* Colorado Rules of Professional Conduct 1.6 (duty of confidentiality), 1.7 (duty of loyalty), and 1.9 (duty of loyalty to former client).  Under Colorado law, LGP continued to owe fiduciary duties to Phillips after the termination of the attorney-client relationship.  *Allen*, 203 P.3d at 559 (Colo. App. 2008) ("This theory does not depend on the existence of an attorney-client relationship at the time of the alleged breach."); Colo. RPC 1.9 (*inter alia*, an attorney "shall not . . . use information relating to the representation to the disadvantage of the former client"), 1.16(d) (protecting client's interests upon termination of the representation).  *See also* RESTATEMENT (THIRD) OF LAW GOVERNING LAW § 33 ("A Lawyer's Duties When a Representation Terminates") (2000); D. Horan & G. Spellmire, ATTORNEY MALPRACTICE: PREVENTION AND DEFENSE § 16-2 (1986) ("[T]he attorney's fiduciary duties do not terminate with the termination of the attorney-client relationship."); *see also. See e.g., Damron v. Herzog*, 67 F.3d

211, 213-15 (9th Cir. 1995) (Duty of confidentiality and limited duty of loyalty survive termination of attorney-client relationship); *David Welch Co. v. Erskine & Tully*, 250 Cal. Rptr. 339, 342-33 (Cal. App. 1988) (Attorney's use of a former client's confidential information to engage in a collection business with the former client's customers was a breach of general fiduciary duties of loyalty and confidentiality owed to the former client); *Schwartz v. Cortelloni*, 685 N.E.2d 871, 877 (Ill. 1997) ("We recognize that a qualified fiduciary duty survives the termination of an attorney-client relationship").

A fiduciary breaches the duties it owes to its past or current client when it engages in "fraud, undue influence, overreaching," or other improper conduct that benefits its interests at the expense of the client's interests. *First National Bank of Meeker v. Theos*, 794 P.2d 1055, 1061 (Colo. App. 1990); *David Welch Co.*, 250 Cal. Rptr. at 342-33; *see*, CJI-Civ. 4th 26:1. That is precisely what has been alleged against LGP in this case – using information learned in the course of representing Phillips to place its interests above Phillips in order to try to leverage concessions at a critical point in time when Phillips had a narrow window in which to resolve his claims against the Patent Defendants.

In support of its Motion, LGP cites no Colorado law and dismisses as "dicta" recent Colorado authority on point – the *Allen* decision cited above – that supports Phillips' position. LGP's citation to the Mallen treatise is misleading as in that numerous authorities are cited therein recognizing a claim for an attorney's breaches of fiduciary duties owed to a former client. *See, e.g.*, Mallen §15:2 at 691-2 (2010) (analyzing *Alleco Inc. v. Harry & Jeanette Weinberg Foundation, Inc.*, 340 Md. 176, 665 A.2d 1038 (Md. 1995) and stating: "The alleged use of inside information after the end of the attorney-client relationship stated a breach arising from the fiduciary relationship." (but adding that the claim was not established based on lack of causation).

Further, LGP's reliance on the two Texas cases is misplaced as under Texas law, it is clear that fiduciary duties extend beyond the termination of the attorney-client relationship. *See, e.g., Sealed Party v. Sealed Party*, 2006 WL 1207732, 7 (S. D. Tex. 2006) ("Although the foregoing authorities make clear that the typical fiduciary relationship and accordingly most fiduciary duties, end when the attorney-client relationship terminates, a fiduciary, including an attorney, may have narrow but defined continuing fiduciary obligations to the former client." *(citing, inter alia Bank Saderat Iran v. Telegen Corp.*, 1997 WL 685247, at *7 (N.D.Cal. Oct. 16, 1997), *aff'd in part, rev'd in part on other grounds*, 30 Fed. Appx. 741 (9th Cir. Feb. 6, 2006) ("Following termination of representation, an attorney owes a continuing obligation to his former clients .... [C]ourts have recognized a breach of fiduciary duty where an attorney gains an unfair advantage over a former client by using confidential information obtained during the relationship.") (internal citations omitted).

The LGP Motion on this point should be denied because it asserts a sweeping legal proposition that is not the law in Colorado. An attorney's fiduciary duties to a client are not extinguished when the attorney-client relationship is terminated.

### B.   LGP's Motion is Premature Because Pre-Trial Disclosure and Discovery Deadlines in this Case are Stayed.

LGP's request for summary judgment on this claim is, as argued above, an effort to gain tactical advantage from the stay of the litigation before the deadline for Phillips to submit Rule 26(a)(2) disclosures. The law is clear in Colorado that to assert a claim for breach of fiduciary duty against an attorney, expert testimony is needed to establish the scope of the duty and the standard of care. *Martinez v. Badis*, 842 P.2d 245, 251-52 (Colo. 1992); *Allen,* 203 P.3d at 568; *Ehrlich Feedlot, Inc. v. Oldenburg,* 140 P.3d 265, 271 (Colo. App. 2006) (claims for breach of fiduciary duty required expert testimony establishing an attorney's duty); *Crystal Homes, Inc. v. Radetsky,* 895 P.2d 1179 (Colo. App. 1995) (expert testimony required to establish the scope of duty attorney owed to former

87

client where attorney brought action against former client).  As such, the scope of the fiduciary duty owed and whether LGP breached any fiduciary duties owed to Phillips is a fact-driven inquiry that should not be decided until after Phillips submits his Rule 26(a)(2) disclosures.  Therefore, the Motion should be denied as premature.

## IV.  CONCLUSION

For the reasons set forth above, Counterclaimant Edward H. Phillips respectfully request that the Court deny in its entirety LGP's Motion for Summary Judgment, and issue such other relief as it deems just and appropriate.

Respectfully submitted this 19th day of January, 2010.

**DON, GALLEHER & SALIMAN, P.C.**

s/ Mark E. Saliman

Shelley B. Don, Colo. Reg. #5457

Watson W. Galleher, Colo. Reg. #16864

Mark E. Saliman, Colo. Reg. #20974

1737 Gaylord Street

Denver, CO 80206

(303) 572-1668

**ATTORNEYS FOR EDWARD PHILLIPS**

## CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of January, 2010, a true and correct copy of the foregoing **COUNTER CLAIMANT EDWARD H. PHILLIPS' RESPONSE TO LGP'S MOTION FOR SUMMARY JUDGMENT** was electronically filed with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Herbert A. Delap, Esq. (cdelap@duffordbrown.com)

Chris G. Baumgartner, Esq. (cbaumgartner@duffordbrown.com)

Dufford & Brown, P.C.

1700 Broadway, #2100

Denver, CO 80290-2101


Daniel R. McCune, Esq.  (dmccune@kcfpc.com)

Miles L. Buckingham, Esq. (mbuckingham@kcfpc.com)

Kennedy, Childs & Fogg, P.C.

1050 17th Street, Suite 2500

Denver, Colorado, 80265


Michael L. Hutchinson, Esq. (hutch@tamblaw.com)

Francine M. Mugge, Esq.

Treece, Alfrey, Musat & Bosworth, P.C.

999 18th Street, #1600

Denver, CO 80202


B. Lawrence Theis, Esq. (Larry.Theis@hro.com)

James N. Phillips, Esq.  (James.Phillips@hro.com)

Holme, Roberts & Owen, LLP

1700 Lincoln Street, #4100

Denver, CO 80203-4541

s/ Mark E. Saliman